## THE STEAMER WEBB.

1. Although an engagement by a steamer to tow a sailing vessel does not impose more than an obligation to carry out the contract with that degree of caution which prudent navigators usually employ in similar services, yet there may be cases in which the result is a safe criterion by which to judge of the act which has caused it. And when a steamer undertaking to tow a ship and having a well-known and straight course to pursue, suffered the ship, after towing her for but an hour or an hour and a half, to run aground at the end of a course of nine miles, on a shoal between three and four miles from the proper line of the voyage, the court held the steamer liable, especially as there was very considerable evidence that her compasses were untrue. And this decision was not affected by the fact that the voyage lay through waters where the currents were variable in the direction of their flow (the direction and force, however, being well known), and though for a part of the nine miles there was a thick fog.

2. The court refused to reverse a decree which on the merits they approved because a deposition which ought not to have been read was read before a commissioner to whom the case was referred to compute damages: there being other evidence that the damages were as great as this court finally awarded.

3. Decree in admiralty in the District and Circuit Courts for a greater amount than the sum for which sureties were bound, on stipulations for a discharge of the vessel from the marshal's custody, reformed by this court so as not to exceed that sum.

APPEAL from the Circuit Court for the District of Southern New York; the case, as assumed by the court on a considerable body of evidence, which it examined and recapitulated, having been essentially thus:

In March, 1859, the steamer Webb, a steamer of good character, belonging to the port of New York and engaged in towing ships at sea, was in Boston, having just then, under charge of a coast pilot named Sherwood, towed a ship to that port. This pilot Sherwood had had twelve years' experience as a coast pilot and was recommended by insurance companies. The owners of the Webb had engaged him to take the steamer back to New York, and they had agreed also with the owners of another ship, then lying at New Bedford, to stop for her on the way and tow her to

New York, and that this towage should be under direction of the same pilot.

In these circumstances one Hazard, master of the ship Shooting Star, lying at Portsmouth, New Hampshire, applied to the owners of the Webb to tow her to New York. The owners agreed in writing accordingly "to tow the ship and *furnish coast pilot* for $625." Having gone to Portsmouth and taken her tow, the Webb, under the pilotage of Sherwood, set off with a good complement of men on her voyage for New York. The course of the voyage lay south, past and round Cape Cod, through the waters that lie between the island of Nantucket on the south side and Barnstable County, Massachusetts, on the north, into what is known as the Vineyard Sound; and so through Long Island Sound to New York. The approaches to the Vineyard Sound (which for the purpose of this case may be considered as beginning with "Handkerchief Shoal" on the east of it; and as you leave the main ocean to enter the passages made by islands and the main land of Massachusetts) abound with shoals and with currents, which last, though close to each other, run in opposite directions. But the currents follow each its own direction, and, like the shoals, are marked with precision upon the charts.

About a hundred yards south of Handkerchief Light—a light upon the shoal—the Webb and her tow found themselves at about 2 or 2½ o'clock A.M.—nearer the latter time, perhaps, than the former—on the morning of March 23d. This was the exact position where they ought to have been in order to reach New York; and their route to that port was by a single straight course west, three-quarters south, to a light called Cross Rip Light, eleven nautical miles (rather less than thirteen statute or land miles) distant from the Handkerchief. This Cross Rip Light is on a boat where there is a fog-bell, audible in fogs, three miles off. The rate of the vessels as they passed the Handkerchief was about twelve knots an hour. The tide, at this time, had just turned ebb, the effect of which was to make the current for about halfway from Handkerchief to Cross Rip run north, and for the

rest of the distance to run southwest. There was a light wind from the southeast; it was raining, but not so that they could not see the coast-lights which they had passed, and even that on the northeast point of Nantucket, more than five miles off. Soon after passing the Handkerchief Light the wind died out, the weather became misty, and in half an hour, and by the time that they got half-way from the Handkerchief to Cross Rip it was so thick that they could not see even the lights of the ship astern; though up to this point the fog had not been thus thick. Lookouts were properly posted. When the fog rose they were on the course mentioned, going, as already stated, twelve knots. The pilot decided to keep up this speed for thirty minutes, expecting at the end of that time to be within hearing of the bell from Cross Rip. Captain Hazard objected *to going on through this fog and desired to anchor*, but on the pilot's statement that a vessel which once anchored where they were had been obliged to cut some spars to avoid running aground, and on an assurance that there was no danger in running to Cross Rip, he yielded and consented to keep on. The pilot gave the course west half south, but the steamer was headed by her compass west-southwest, in order to allow for a variation from local attraction caused by iron on board the vessel, which Captain Hazard supposed to be one and a half points south of their true course when running west, diminishing to zero, when running south. They ran on this course at full speed for thirty-two minutes, and then, not hearing the bell, shut off steam, reducing their rate to between two and three knots, and having the lead cast by another pilot named Wilson, the captain of a Boston packet, who as a friend of Sherwood's had been allowed a free passage to New York. After running slow for forty-five minutes they found themselves in shallow water, which Sherwood took for a shoal called Horseshoe Shoal, that lies about a mile north of Cross Rip. To avoid this he turned his steamer towards the south, and immediately the ship was aground. She had run on Tuckernuck Shoal, a point about four miles southeasterly from both the Horseshoe and Cross Rip, about nine miles

southwest by west half west from the Handkerchief Light, and fully *three and a third miles to the south of the course in which the vessels ought to have been.* This was at half-past three, or a very little later, in the morning. After some vain endeavors to drag her off, the steamer left the ship and cast anchor in the neighborhood.

After daylight the steamer tried to approach the ship, to give her the end of the towing hawser, the ship having drifted off the shoal and then riding at anchor. The crew began to heave on the anchor. As was alleged by the people on the steamer, they on the ship hove short, and the vessel picked up her anchor and drifted away. But the ship had, in fact, lost her anchor. She soon went ashore again, her stern resting on the sand. The wind getting very strong and the sea violent, under a gale which had suddenly sprung up, the ship, in order to prevent her bow being thrown upon a ridge, which, if she struck, her captain thought might dash her to pieces, after losing the port anchor cast out the starboard one. The ship swung directly upon the flukes of this anchor and knocked holes in her bottom through which she filled with water. Before this she had not leaked. The gale was so high and the sea so rough and boisterous that communications between the vessels could not be made. The steamer then went to Edgartown, a town on the island of Martha's Vineyard, for a steam-pump and wreckers. In the meantime, and before the Webb got back, one Levi Hotchkiss—a part owner of the vessel, who happened to be aboard—got on to a sloop and, acting with energy, procured relief from Boston and Nantucket. Thus aided, the ship got off, and her leaks having been temporarily stopped, she was got into New York and sent into dock for repairs.

After the accident, the Webb's compass was carefully examined and tested; and considerable testimony tended to prove that the variation from local attraction (the iron on the vessel) on the west course was one and a half points to the north, instead of to the south, as had been supposed by the captain and pilot.

Hereupon the owners of the ship, by proceeding *in rem,*

libelled the Webb for $17,500 damages, and the marshal seized her. She was, however, discharged from his custody on her owners entering into bonds for $18,000 as the value of the ship, and $250, the sum estimated as possible amount of costs, conditioned to pay what might be awarded by final decree.

To establish the case of the ship the testimony of Hotchkiss, already mentioned, *one of her part owners*, had been taken, June 20th, 1859, "saving the exception as to the competency of the witness;" the statute of July 16th, 1862, which allows parties and interested witnesses to testify not having then passed. Damages suffered by the ship, and much exceeding $18,000, were proved by the bills of repairs produced and by other witnesses than Hotchkiss. The deposition of Hotchkiss was not read in the District Court; without hearing which that court decreed against the steamer, and referred the case to a commissioner to ascertain damages. The commissioner, however, did hear the deposition, and awarded $20,378 damages; this being followed by a final decree in the District Court for $24,590. On appeal to the Circuit Court, that court not reading the deposition, affirmed the decree, and gave a final decree there for $28,292. From that decree the case was brought here by the owners of the steamer, the record which came here including Hotchkiss's deposition.

*Mr. E. C. Benedict, for the appellants :*

The owners of the steamboat were not common carriers nor insurers. All they contracted for was a propelling power to tow the ship with reasonable skill and care. They did not guarantee successful towing, free from all accident and injury. Like the professional man, they are responsible only for actual negligence, for the lack of such care as a careful man would give to his own property.* And this negligence must be proved by the libellant. The presump-

---

* The Julia, 1 Lushington, 231; Wells *v.* The Steam Navigation Company, 2 Comstock, 208-9.

tion is against the negligence, and the burden is on him to prove it affirmatively, not only that there was negligence, but culpable negligence that caused the damage.*

Now here the steamer and the care and precaution on board of her were of the best kind. The pilot, Captain Sherwood, was a competent pilot, of large experience and well recommended; and he had the aid of Wilson, a skilful friend. The lead was heaved, shoals were watched, and there was a good lookout.

The damage was caused by the perils of the sea—the inevitable accidents of the navigation—the act of God; the rain, the fog, the darkness, the variable, conflicting, and imperceptible currents and the winds. The waters through which this navigation lay are very peculiar waters. Islands and shoals, and swashes, and channels abound. The currents do not flow regularly, six hours one way and six hours another. At different parts of the tide it will run in the same place two hours in one direction, and in the next two hours in the opposite direction in the same ebb or flow; and in some places, when the tide will be running west, the same tide, at a little distance off, will be running southwest, or south. These uncertain and contradictory currents and tides, make the navigation dangerous in the night in fair weather, even when the many lights in light-houses and light-ships are visible. Of course they make it doubly so when nothing is visible in consequence of dense fog. And when such a fog shuts suddenly down, there is no retreating nor evading or escaping, except by slow and careful going on, with abundant lookout and a constant casting of the lead. All that we gave. We slackened speed; we heaved the lead; we kept a sharp lookout, with in fact two pilots.

Shutting off the steam was a plain duty, and yet doing this caused the vessel to run more slowly, and allowed the currents to have more effect on it. The ship would thus be under the influence of two equal forces operating nearly at right angles; steam driving her to the westward and the

* The Farragut, 10 Wallace, 334.

current bearing her to the southward. The combination of those two forces would force her between the two on a diagonal line directly upon Tuckernuck Shoal on which she struck.

There is no sufficient evidence to discredit the compasses. They were in good condition. Their variation, caused by the iron on board, as is the case in all steamers, was regular and well known. On an east or west course it was a point and a half; that is to say, to make a west course you would have to steer west by south half south, and on an east course, the same rule. This variation was properly allowed for in all courses.

But after all, the injury to the ship was caused by her own mismanagement after she struck the shoal and cast her port anchor. She got off the shoal where she first grounded without any injury, and if after that she had been guilty of no negligence there would have been no damage. Instead of remaining quietly at her anchor where the steamer might take hold of her, and take her out with a long chain, on her voyage, they hove the anchor short, and the ship then picked up her anchor and went ashore—broke adrift, and drove astern on to the shoals. This heaving short was a great negligence, and was the first and material cause of damage. She then lay with her stern on the sand, her bow swinging and straining on her short chain, which parted; and if left to herself she would have gone over the shoal into deep water. It was a great negligence which let go the starboard anchor on the starboard side of the ship when she was swinging to starboard, her stern lying aground. As a natural consequence she swung on the anchor and stove holes in her bottom, the second and the principal cause of the damage. If no anchor had been thrown out, the ship would have gone through the shoal into deep water and floated without any damage except scraping the copper.

Neither was the steamer in fault. Her duty to the ship was to tow her to New York, to act as her propelling power, to use all reasonable care and diligence to do so, and if she got in difficulty to endeavor to extricate her. It had this

extent; no more. The captain of the steamer was not under the least obligation to throw his boat alongside of that ship in the midst of breakers and uneven and rolling shoals in a tempestuous gale. It could not possibly do the ship any good, and might destroy them both. It was his duty not to do it, and it was his duty to go to the nearest port and procure surf-boats and wreckers to aid her, which was just what he did. During the time that the ship was ashore, the steamer tried to get to her, making repeated efforts, backing in towards her, but was unable to get to her. The noise made by the gale prevented hailing, and the ship could not fail to know when the steamer turned toward Edgartown that it was going for assistance, without which nothing useful could be done.

Under the contract "to furnish a coast pilot," the pilot was the servant of the ship and not of the steamer. The mate of the tug was not responsible for the conduct of the pilot. His only contract as to the pilot, was to get a pilot for the owner of the ship, and to get one of good repute for skill and diligence. Hazard was the agent of the owner of the ship, who accepted and approved his choice of a pilot.

The commissioner also allowed the deposition of Captain Hotchkiss, which was incompetent, to be read in evidence before him on the question of damages. The deposition, not being competent when taken, did not become competent by lapse of time, or by any subsequent statute. This improperly affected the final decree, which on account of the result which the error caused ought to be reversed.

The libellants at best are entitled to a decree for but $18,250. The sureties are only bound to the extent of the obligation expressed in their bond.*

*Mr. D. D. Lord, contra.*

Mr. Justice STRONG delivered the opinion of the court.

The libel filed in this case against the steamer is to recover the damages sustained by the ship in consequence of

---

* Ann Caroline, 2 Wallace, 538

the alleged careless and unskilful towage, and the first question is whether the towage was either unskilful, or negligent.

It must be conceded that an engagement to tow does not impose either an obligation to insure, or the liability of common carriers. The burden is always upon him who alleges the breach of such a contract to show either that there has been no attempt at performance, or that there has been negligence, or unskilfulness to his injury in the performance. Unlike the case of common carriers, damage sustained by the tow does not ordinarily raise a presumption that the tug has been in fault. The contract requires no more than that he who undertakes to tow shall carry out his undertaking with that degree of caution and skill which prudent navigators usually employ in similar services. But there may be cases in which the result is a safe criterion by which to judge of the character of the act which has caused it. Had the ship in this case been towed upon a shoal ten miles north or ten miles east of Handkerchief Shoal, after leaving that shoal for Cross Rip, it cannot be doubted that the fact of the stranding at such a place, would, in the absence of explanation, be almost conclusive evidence of unskilfulness, or carelessness in the navigation of the tug. The place where the injury occurred would be considered in connection with the injury itself, and together, they would very satisfactorily show a breach of the contract, if no excuse were given. At least they would be sufficient to cast upon the claimants of the tug the burden of establishing some excuse for the deviation from the usual and proper course.

In the present case the departure from the true course was not so great, but it was enough to devolve upon the tug the duty of explanation. The ship was, as we have noticed, towed upon a shoal more than three miles south of the proper course to Cross Rip Light. Had the course been a long one the deviation would not have been so remarkable. But as the entire distance from Handkerchief Shoal to Cross Rip is less than thirteen statute miles, and as the ship was stranded when only about three-quarters of this distance was

passed, it is apparent there must have been either bad management of the tug, or some unusual cause must have operated to produce the disaster, a cause against which ordinary prudence was not bound to guard. Certainly this is enough to impose upon the tug the necessity of explaining how she came to be so far off her course in running so short a distance. We do not say that in order to excuse her it must be shown the accident was inevitable, but it ought to appear that so remarkable a deviation from her correct course, made so soon after leaving Handkerchief Light, was consistent with cautious and skilful management.

The weight of the evidence is that the ship was run upon the shoal in a little more than an hour, manifestly not more than an hour and a half, after she passed Handkerchief Light. All the witnesses agree that it was between three and four o'clock when she took ground. It follows that the entire departure from the true course was made within this period of an hour, or at most, an hour and a half.

The excuses set up in behalf of the steamer are that the night was foggy and dark, and that the currents were variable, conflicting, and imperceptible. There is no evidence that there was any wind which could have caused embarrassment until some time after the ship had stranded. It blew lightly from the south and east, and its tendency, therefore, was to keep the steamer up to the northward of her true course. It was raining, but there was no fog until after Handkerchief Light had been passed. Soon afterwards the weather began to grow misty and thick, but the clear preponderance of the testimony is that it was not until they had passed over about half the distance to Cross Rip that the fog became so dense that the lights could not be seen. If this is so there was no difficulty in determining the position of the steamer. It is not perceived, however, that this is very material. The fog, whether dense or thin, was itself no embarrassment to the steamer's taking and keeping the right course, a course marked on the chart, and well known by the pilot and by the captain.

Though the currents were variable in the direction of

their flow, yet both their direction and their force were well known. All that was needed was to give them careful attention, and to make allowances for their operation. So much prudent navigation required. There is no evidence that they were of unusual strength on the night of the disaster, or that they ran in an unusual direction, and there was nothing in the state of the weather to cause a difference from what was common. Ordinary skill was quite sufficient to enable the pilot of the tug to counteract their force, and to keep both the tug and the tow on the proper course. It was during the first third of the tide that the passage was made over the first third of the course from Handkerchief Light to Cross Rip, as stated by the pilot. During this time the current or tide was setting northwest, bearing the steamer northward, and on the last half of the course, on which she entered before the steam was shut off, the ebb-tide was setting southwest. Such is the evidence, as also that, after the steam was shut off, the motion of the steamer through the water was at the rate of two or three knots an hour, and that she was thus moving about forty-five minutes before the ship struck. If this is so, she was constantly making westing during that three-quarters of an hour, if headed right; and, if she was in the right position when the steam was shut off, the calculation is easy that shows a southwest current could not have carried her on to Tuckernuck Shoal. It is plain, therefore, the stranding of the ship was not the fault of the currents. They do not account for it, even if nothing was done to counteract their known tendency.

There is nothing else in the case that tends to show that the disaster was not due to the negligence of the tug. On the contrary, there is very considerable evidence that her compasses were untrue, and so deranged as on a westerly course to head her too much to the south. This, of itself, would account for the deviation, and this of course would be the steamer's fault.

It has been strenuously argued that the great injury to the ship was caused by her own mismanagement after she

had struck the shoal and cast her port anchor. After day-light, when the steamer was about to back down in order to attach herself again to the ship, which had then got off the shoal and was riding at anchor, the ship's crew com-menced heaving on the anchor; and it is alleged they hove short, so that the anchor was picked up, and, a gale coming on to blow suddenly, she went again upon the shoal. The anchor, however, instead of being picked up, was lost, and it was proper to heave upon it in order to bring the ship nearer the stern of the steamer, and thus aid in the effort to renew attachment to the steamer. We do not discover in this any negligence on the part of the ship. What was done was rendered prudent, if not necessary, by the prior miscon-duct of the tug. Nor was casting the starboard anchor, after the ship broke adrift, negligence under the circumstances, though it proved unfortunate, and though the ship after-wards swung upon it and bilged. The port anchor had been lost, and the wind was then blowing a gale. Probably the bilging was what saved the ship from total destruction; and, if casting the starboard anchor was an act of mistaken judgment, it cannot excuse the tug, which negligently brought the ship into the peril from which she sought thus to escape.

The attempt to escape responsibility under the allegation that the wrong, if any, was that of the pilot, and that the pilot was the employee of the ship and not of the steamer, wholly fails. Neither the written contract for towage nor the antecedent negotiation establishes any such thing. Un-der the engagements of the steamer, assumed before the contract of towage was made, it was impossible to have any other pilot than Sherwood, who was the pilot of the steamer, and there is nothing to show that the ship undertook to run the risk of pilotage.

It is finally objected that the deposition of Levi Hotchkiss was allowed to be read, though he was incompetent when it was taken. It does not appear to have been used in either the District or the Circuit Court, though it was read before the commissioner appointed to ascertain the damages. Ob-

jection was made to it there, and it must be conceded the deposition should not have been received, but its reception can hardly justify us in sending the case back for a new trial. When the commissioner received it, if it was intended to insist upon the objection, application should have been made to the court for an order to exclude it. This was not done. Conceding, however, that the error was not thus cured, still the evidence before the commissioner related only to the amount of damages, and without the testimony of Hotchkiss, the damages were plainly more than the libellants are entitled to recover in this proceeding. The libel was *in rem*, against the steamer, and the decree cannot be for more than is within the jurisdiction of the court. The steamer was discharged from arrest, on stipulation in the sum of eighteen thousand dollars for value, and two hundred and fifty dollars for costs. The stipulators, to the extent of their stipulation, have been substituted for the steamer, and thus nothing but the eighteen thousand dollars value and two hundred and fifty dollars for costs is within the control of the court. To that extent and no greater the stipulators have subjected themselves to the judgment of the court, and they cannot be made liable as stipulators beyond it. This was determined in the case of *The Ann Caroline*,* and we need not repeat what was then said. The decree in this case was largely in excess of the stipulation, and while it is affirmed upon its merits, it must be modified in regard to the amount of damages recoverable from the stipulators.

The decree of the Circuit Court is AFFIRMED, WITH THE MODIFICATION that it be reduced to the sum of eighteen thousand dollars damages and two hundred and fifty dollars costs; and it is further ordered that each party pay his own costs in this court.

* 2 Wallace, 538.