WILLIAM TEBO, Respondent, *v.* HENRY GREGORY JORDAN and Others, Appellants.

*Shipping — the duty of a mariner in a perilous position to anchor or take soundings is not a question for the jury — a vessel must be paid for as long as it is used, even though unseaworthy.*

A firm entered into a charter party with one Tebo, the owner of a steamer, by which the latter agreed, for a stated period, to tow the coal barges of the firm in coast-wise traffic, the firm to be at liberty to place on the steamer a representa-tive whenever they saw fit. It was agreed that for dangers of the sea the steamer was not to be responsible.

At about six o'clock in the evening of December first the tow, with a representative of the firm upon the steamer, was off the Nantucket shoals, near the Handker-

chief Light-vessel. The course was from thence to Shovelful Light-vessel, a distance of three miles.

The night was dark, and a thick haze was on and near the water. The master could not see the Shovelful Light when he left the Handkerchief Light, but could see the Monomoy Point Light, distant a mile from it. The channel was narrow and full of shoals.

The captain did not anchor but proceeded on his course, and when about a mile from the Handkerchief Light, miscalculating the force of the tide, for which he allowed too much, went too far to the westward and ran on a shoal.

The firm refused to employ the steamer further, because of the accident and the damages resulting to them therefrom.

In an action brought against them by Tebo for the use of the steamer for the unexpired term:

*Held*, that it was error for the court to refuse to charge that, if the weather was such that the master and pilot were unable to see the lights and determine their position, it was the duty of those in charge of the tug to anchor until they could verify their position and proceed with safety.

That, in any event, it was error for the court to leave it to the jury to say whether such was their duty.

That the effect of the submission of this question to the jury was to leave it to them to establish the legal rule which should govern mariners in such a situation.

That, upon the same principle, it was error to submit to the jury the question whether, if the master and pilot were in doubt about their position and the proper direction to pursue, it was their duty to take soundings.

That the firm were bound to pay for the steamer as long as they used her, even though she was unseaworthy. (INGRAHAM, J., dissenting.)

APPEAL by the defendants, Henry Gregory Jordan, Morton Stimpson Crehore and Charles Daniel Jordan, from an order, entered in the office of the clerk of the city and county of New York on the 14th day of February, 1891, denying their motion for a new trial; and also from a judgment of the Supreme Court, entered in said clerk's office on the 30th day of January, 1891, upon a verdict in favor of the plaintiff for $2,970.69, after a trial at the New York Circuit before the court and a jury.

The action was brought to recover the amount alleged to be due for services of the plaintiff's tug-boat under a charter party. A defense was interposed that the tug-boat was unseaworthy and without any qualified pilot, and that as a result two coal barges of the defendant were stranded and damaged through the negligence of the officers of the tug-boat.

*J. A. Shoudy*, for the appellants.

*W. W. Goodrich*, for the respondent.

Daniels, J. :

The defendants entered into a charter party with the plaintiff, who was the owner of the steamer B. T. Haviland, to tow their coal barges from New York, Philadelphia or Newport News to Boston, or some other port not east of Portland, in Maine. This charter was made on the 23d of October, 1888, and was to extend from the 26th of the month to the 1st of May, 1889 The compensation to be paid for this use of the steamer was the sum of $2,200 per month, and the privilege was reserved of canceling the charter upon one month's notice. It was further stipulated that the defendants were at liberty to place a representative on the steamer, at any time they saw fit, who was to be free of cost to the tug excepting the food which was to be supplied. And for damages which might be caused by the dangers of the sea the steamer was not to be held responsible. Under this charter the steamer was engaged in towing the vessels or barges of the defendants until on or about the 8th of December, 1888, when a notice was served declaring that the defendants would not employ the steamer after that date on account of the stranding of December 2, 1888, and other injuries received by the tows while under charge of the steamer. The plaintiff declined to acquiesce in this termination of the charter, and after the expiration of one month from the service of the notice brought this action to recover the price stipulated for in the charter, after deducting what the steamer had otherwise earned during that month. And, by way of defense to the action, it was alleged that, through the carelessness or mismanagement of the steamer, two of the defendants' vessels, which it at the time had in charge, were run aground and stranded, from which injury was received by the vessels, and a large amount of money expended in repairing those injuries. And whether this grounding of the vessels was attributable to the unskillfulness or negligence of the persons in charge of the steamer at the time, was the subject mainly contested upon the trial of the action.

Under such a charter, as this was, the rule is quite well settled that the owner becomes obligated to use care and skill in avoiding injury to the vessels constituting the tow. This rule was clearly stated in *Alexander* v. *Greene* (7 Hill, 533), and has been sustained in the decisions of *Wells* v. *Steam, etc., Company* (4 Seld., 375); *Taft* v.

*Carter* (59 Barb., 67); *The Margaret* (94 U. S., 494, 497) and *Steamer Webb* (14 Wall., 406). It, therefore, became a matter of fact, to be determined from the evidence which was taken, whether the vessels were grounded by reason of the inattention, carelessness or unskillfulness of the persons in charge of the steamer at the time, or from what is denominated in the charter the dangers of the sea. It appeared by the evidence that the vessels and the steamer ran aground near what is called Monomoy island. They were then on their way from Newport News to Boston, and the vessels were laden with coal, one drawing about nineteen feet and the other twenty-one feet of water. This occurrence took place on Sunday night of the first of December, and about six o'clock in the evening. About that hour the steamer with the vessels in tow reached what is called and known as the Handkerchief Light-vessel. From there her course lay in a direct line to what is called the Shovelful Light-vessel, and proceeding from that point to Pollock Rip Light-vessel. The distance between Handkerchief Light to Shovelful Light was from three to five or six miles. And when about one-third of this distance had been passed the steamer and the vessels ran aground. This was caused by the failure on the part of the steamer to follow the course laid down between these two lights, and passing so far to the left of the course as to go beyond the channel and run into shoal water. And it was by the stranding which there took place that it is stated the injuries complained of were sustained by the vessels.

On this trip a representative of the defendants was on board the steamer, and he, together with the persons in charge of the vessels, testified that the night was clear and dark, and when the steamer, with her tow, left Handkerchief Light, Shovelful Light was in sight. And if they were correct in their testimony, then it is entirely clear that there was no obstacle in the way to prevent the steamer from passing directly up the channel to Shovelful Light. But that the night was clear was denied by the persons in charge of the management of the steamer. They testified that the night was hazy and foggy, and that Shovelful Light was not visible prior to the time when the stranding took place, but that the light most prominently in view was the Monomoy Point light, situated upon Monomoy island. And that at this time the wind was blowing from a westerly direction, and the tide, which was rising, flowed in the same manner;

and that there was reason to apprehend, from the narrowness of the channel, that the steamer and vessels might be run aground on the easterly side of the channel, and for that reason the course bearing to the west was taken. But it is conceded, in the evidence of the master of the steamer, that the force of the tide was misapprehended or miscalculated, and by that circumstance the steamer went farther to the westward than it was intended she should go. The intention is stated ·by him to have been to follow the course between Handkerchief Light and Shovelful Light, and that the steamer was. put to port, as far as that was done, to follow what was supposed to be the line between these lights. And as there was a conflict between the evidence of the witnesses who were sworn for the defendants and this testimony given on behalf of the plaintiff, and the jury rendered a verdict in his favor, the effect of the evidence given on behalf of the plaintiff must be followed as the controlling proof taken upon the trial. This evidence was mainly obtained from the witness John Gully, who was the master of the steamer. He testified, as near as he could remember, he had made about thirty trips over the water upon which he was towing at the time when this accident occurred; that he had charts of the route on board at the time and was pretty familiar with them, and that he knew Shovelful Light was a red light, which was a fact agreed to by the witnesses whose attention was directed to the appearance of that light. He further testified that, as he approached Shovelful on this voyage the wind was blowing on the port hand of the vessel, setting it over towards the Stone House shoals, and the tide was running in the same direction as the wind. His statement was that he could not see the Shovelful Light; that there was a haze low on the water. He could see all the other lights, which were higher and white lights, but Shovelful was the lowest around in that vicinity, which, however, according to the other evidence, was very nearly of the same height as the light on the Monomoy Point. His testimony further was that he could not see Shovelful Light, which had been put there for a guide; and if he could have seen Shovelful at the time he left Handkerchief, he should have left it on the starboard side and kept it on the starboard bow until he got near to it, and then left it on the port side to pass up to the Pollock Rip Light-ship. His cross-examination was still more explicit as to the situation. He there

stated that they shaped the course for the Shovelful Light-ship, which was about three miles distant, and that the Shovelful and Monomoy Lights were a mile or three-quarters of a mile apart. He also added : " The Shovelful Light-ship is one single red light. I didn't see it when we came around the Handkerchief Light-ship first. I saw it after we got off the shoal. Provided there was a perfectly clear horizon, it should be plainly visible from Handkerchief Light-ship. It was a dark, clear night, but I said before, and I say now, there was a haze on the water, low down on the water. It was kind of a very thick, misty looking haze." He also stated that it was very narrow there, and there are shoals each side of us going through there. It is a dangerous place, and that it was good navigation to go ahead when you cannot see and do not know where you are going in that case. After we got to Handkerchief Light-ship to go and anchor her I would stand about as good a chance of going ashore as I would going on. It was full of shoals all around. It is narrow, and it is policy to keep on. It was in a dense fog. He stated that it was an accident to have run on this shoal, and then said : " It is liable to occur to any mariner, to the smartest navigator, because I could not see the light. It was hazy, and in running the course the vessel had got to windward of her course. I considered it very good judgment to keep to the weather side. It was a narrow channel." These statements of the witness described the locality and the condition of the atmosphere, as well as the weather, as the jury probably accepted them in rendering their verdict. And the witness gave one further addition to them by testifying that it was hard to know what the actual strength of the tide was, and that he made a miscalculation ; that it sometimes ran stronger than at other times. His evidence was also corroborated by the pilot of the steamer. And as this evidence must be accepted as that which is to be controlling over the disposition of this appeal, it presents the question whether the master of the steamer observed reasonable or ordinary care in endeavoring to navigate her as he did after leaving the Handkerchief Light-ship. The point to be reached was the Shovelful Light, which, according to this evidence, was invisible. The night was dark, hazy and foggy, and the tide, as well as the wind, set against the port side of the steamer. And all that she then had to run upon was the course laid down by the chart from

Handkerchief to Shovelful and the light on the Monomoy Point. And in this condition, with a narrow channel, full of shoals all around, as the witnesses described it, the question arises whether ordinary care was observed in endeavoring to navigate the steamer with these tows through this narrow channel in this condition at that time.

A somewhat similar state of affairs was considered in the case of *The Deer* by Judge BLATCHFORD (4 Benedict, 352), and in the case of *The Gratitude* (25 Fed. Rep., 160), and *The Farnsworth* (6 id., 307), the tenor of which decisions would require that the master should come to an anchor and await a change in the condition of the weather before undertaking to navigate the steamer and the tows through this narrow channel in the fog and haze stated by these witnesses to prevail at the time, and which prevented them from observing the Shovelful Light. All the other lights were visible, including the more distant Chatham Light. This was the only one which is stated to have been concealed from their observation. And it was under this state of the evidence that the defendant's counsel requested the court to charge the jury: " That if the weather was such that the master and pilot were unable to see the lights and determine their position, it was the duty of those in charge of the tug to anchor until they could verify their position and proceed with safety."

But the court declined to charge as requested, and, on the contrary, charged as follows: "I also leave it to the jury to say if the weather was such that the master and pilot were unable to see the lights and determine their position, whether, upon all the evidence in the case, it was the duty of those in charge of the tug to anchor until they could verify their position and proceed in safety, and I decline to charge as requested."

The defendant's counsel duly excepted to the refusal of the court to charge as requested, and to the charge as given in that behalf as above stated.

Under the rule prescribed by the authorities, the proposition which the court was requested to submit to the jury appears to have been justifiable, in view of the facts, as they were related by the plaintiff's witnesses. For whether the steamer should have anchored, which was not proved to be an insecure precaution, was a proposition to be decided by the court. And as the channel was narrow

and beset with known shoals and dangers, and the only light that could surely indicate the safe course to be followed was concealed by the fog, reasonable care appears to have required that to be done to insure the safety of the vessels in charge of the steamer. And even if that should not be held to be the law of the case, it was clearly erroneous for the court to submit the question to the jury for them to determine whether it was the duty of the persons in charge of the tug to anchor until they could verify their position and proceed in safety. For that was submitting to the jury not the determination of any matter of fact, but what should be the legal rule applicable to and governing the conduct of persons at the time in charge of this steamer. And to the submission of this question to the jury in this form the counsel for the defendants excepted. And that exception seems to have been well presented. For it was no part of the province of the jury, in case the position and weather were as they have been stated to be, to determine the duty of those in charge of the tug as to coming to an anchor until they could verify their position and proceed in safety. The more practical rule appears to be that where the channel was of the description in which it has been described by the plaintiff's witnesses, and the night prevented them from discovering the point or light to which they were to proceed, that they should not attempt to prosecute such dangerous navigation until they were able to discover the light, which was their guide, and proceed in safety.

The same disposition was made of another proposition presented to the court, where the request was made for the direction to the jury that if the master or pilot were in doubt as to their position and the proper direction to pursue, that it was their duty to take soundings for the purpose of ascertaining that position. But this, in like manner, was declined by the court. And it was left to the' jury to say whether, if that doubt did exist and the persons in charge were unable to see the Shovelful Light, it was the duty of the master or pilot to take soundings for the purpose of ascertaining their position. An exception was taken to the refusal to charge, and also to the charge which was given to the jury. And the direction, as it was given, placed the jury in the position to determine what was the duty of the master or pilot in the situation which had been described. And as that

was a legal principle to be settled by the court, it certainly was improper to submit it to the determination of the jury. An exception was also taken to the direction given by the justice presiding at the trial that the defendants were bound to pay for the vessel as long as they used it, even though she was unseaworthy. But this proposition has the support of *Work* v. *Leathers* (97 U. S., 379). And even without that authority it was clearly the law of the case, for, subject to their claim for damages, the defendants did not and could not legally deny their liability to pay the charter hire of the steamer up to the time when the notice was given terminating their employment of her. But as the jury should not have been permitted to decide upon the duty of the master or pilot, either in respect to taking soundings or coming to an anchor, which should have been decided by the court, and that authority confided to them may very well have been entirely decisive of the case, the judgment and the order should be reversed and a new trial directed, with costs to the defendants to abide the result.

Van Brunt, P. J., concurred.

Ingraham, J. (dissenting) :

The sole question presented for determination in this action was, whether the steam-tug Haviland was seaworthy, and was in charge of competent officers, and with a qualified pilot.

The court below submitted that question to the jury, stating in the charge : " This question of seaworthiness is one that must be determined by the jury upon all the evidence in the case. If the jury should find that the vessel was seaworthy itself and provided with a skillful master and pilot, then, as matter of law, I charge you that the defendants had no right to terminate the charter party, and the plaintiff would be entitled to recover. If, on the other hand, the jury should find, as matter of fact, that the vessel herself was not seaworthy, or that the grounding of Nantucket shoals and the other mishap, which it is claimed befel the vessel in her voyage, were due to the want of skill of the master or pilot, then the defendants had the right to cancel the charter party."

The court then called the attention of the jury to the testimony, and again stated to the jury the question that they were to determine as follows :

" If they should be of the opinion that these mishaps occurred by reason of the want of skill on the part of the master or pilot, then the defendants had the right to cancel this charter. If, on the other hand, the vessel was in proper condition, and the master and pilot had the proper skill to navigate the vessel over this course, and the going ashore and getting out of the channel were due to ordinary dangers of the sea, then the defendants had no right to cancel the charter party."

The jury found a verdict for the plaintiff, thus finding that the tug was seaworthy, in charge of competent officers, and that the stranding of the barges was not caused by the want of skill on the part of the master or pilot, or one of them, and I think that this finding was sustained by the evidence.

The captain of the tug was forty-seven years old, had been master of tug-boats for twenty-five years, and was well acquainted with Boston harbor. The pilot Barnard was on board and was at the wheel piloting the vessel at the time she ran on the shoal, and there is no evidence to show that either the captain or the pilot was not a competent man, skilled in his profession, except from the fact of the accident in question ; and whether or not, under the circumstances, it was their duty to have anchored instead of proceeding, was a question that called for the exercise of their judgment as master and pilot of the vessel, and their determination to proceed cannot be said to be, on the facts that appeared on the trial, such evidence of incompetency or unskillfulness as to require the court to take the question from the jury; and so the course of the vessel in entering Boston harbor, and the allowance to be made for the wind and tide, were questions that called for the exercise of their judgment; and it cannot be said that, because they made a mistake in allowing for the strength of the tide so as to go out of the course, it was such an error of judgment as to show, as a matter of law, that they were not competent and skillful navigators.

It was for the jury to say from all the evidence whether or not the implied warranty of seaworthiness of the tug, and that the owners would furnish competent and skillful navigators had been complied with, and the jury by their verdict have found that it had been and that the accident that happened was not due to the want of skill on the part of the master or pilot, but was due to the

ordinary dangers of the sea. Upon that finding, under the terms of the charter party, plaintiffs were entitled to their verdict. The cases cited by defendants from the Admiralty Court do not apply, for there the court is to determine the facts as well as the law, while in this case the facts were for the jury.

I have examined the requests to charge submitted by defendants and which were refused by the court, and I do not think that the defendants were entitled to have any of such requests charged. The form in which this question was submitted to the jury was certainly as favorable to the defendants as the facts warranted, and I think no error was committed that calls for a reversal of the judgment.

Judgment should, therefore, be affirmed, with costs.

Judgment and order reversed, and a new trial directed, with costs to the defendants to abide the result.