## THE KALKASKA.

(Circuit Court of Appeals, Seventh Circuit. April 9, 1901.)

Nos. 725, 726.

1. TOWAGE—RELATION AND DUTIES OF TUG TO TOW—LOSS OF TOW.

An engagement to tow imposes an obligation to exercise that degree of caution and skill which prudent navigators usually employ in similar service, and, where the tows are stranded at a point far off their proper course, the burden is cast upon the towing vessel to establish some excuse for the deviation.

2. SAME—NEGLIGENT NAVIGATION OF TUG.

A propeller was proceeding down Lake Superior from Duluth with three tows on a line, all the vessels being loaded with lumber piled several feet above their decks. Early in the morning Devil's Island was seen to the southward about the usual distance, and the master then took a course intended to take the vessels about 4 miles to the north of Eagle Harbor, which was 123 miles distant. The weather was smoky through the day, so that the shore could not be seen, and a 20-mile wind blew from the west and northwest, striking the vessels on the port side. No allowance was made for drifting until 4 p. m., when the vessels had made about 90 miles with the wind and sea constantly increasing. Then the course was changed more to the northward, but no soundings were taken. At 8:30 the vessels stranded on a reef which was 17 miles out of their proper course. The tug sheered off, and, with her assistance, the first tow was released in a damaged condition, and taken to port, but the line upon which the second tow was held parted, and the last two tows were lost. *Held*, that the burden rested upon the tug to show that she was supplied with a compass such as ordinarily used, which was in proper condition, and that due care was exercised in navigation, and that in the absence of any evidence in regard to the compass, the deviation from the proper course must be held the fault of the tug either in not taking the proper course, or because the master failed to make proper allowance for the drifting of the vessels owing to the wind, and the fact that their loads were high above the decks, and to take soundings to ascertain their position, which, as appeared from the chart, would have shown that he was' dangerously near the shore at the time he first changed his course, and would have enabled him to avoid danger by proceeding slowly, and by continued soundings.

3. SAME—CONTRIBUTORY FAULT OF TOW—ACTION IN EXTREMIS.

Immediately upon touching bottom, the tug signaled to the tows to starboard their helms, following by alarm signals. The last two tows were sailing vessels, the first of which failed to hear the first signal, and, her line having parted, she grounded within a minute after the signal was given. The last tow obeyed the signal, but was compelled to immediately port again to avoid collision with the one in front of her. *Held* that, even if, by the utmost promptness of action, they might possibly have escaped, their error, if any, was one in extremis, which could not be urged by the tug as a contributory fault.

In Admiralty. Appeals from the District Court of the United States for the Northern District of Illinois.

On September 17, 1898, the steamer Kalkaska departed the port of Duluth bound for the port of Chicago, having in tow, in the order named, the barge Aloha and the schooners J. H. Mead and Mediator. The Kalkaska was a

vessel of 178 feet keel and 33.10 beam, and of 555 net tonnage, and able to carry ar average cargo of 750,000 feet of lumber. At this time she was laden with lumber, having a deck load of from 14 to 16 feet above the rail, and was drawing 14.6 feet water aft and 13.10 feet forward. The Aloha was an open-deck lumber barge, and drew 13 feet of water, the J. H. Mead was a full-rigged three-masted schooner, and the Mediator a sailing vessel. The latter carried at this time a cargo of 337,000 feet of lumber, and drew 10.6 feet of water. The record states that each of the tows had a full cargo of lumber, but does not otherwise give a description of the vessels or their capacity. The story of the voyage and the resulting disaster is thus described by the claimants of the steamer in their answer:

"Eighth. That on the morning of the 18th of September, 1898, at about five o'clock a. m., the atmosphere being more or less filled with smoke, the said propeller and her tow, consisting of the barge Aloha and the schooners J. H. Mead and Mediator, in the order named, were abreast of Devil's Island, Wisconsin, in the waters of Lake Superior. That at this point it is usual for the steamers bound down the lake to change their course for a point off Eagle Harbor, Michigan, and accordingly the propeller's course was changed to east-northeast. The wind about the same time began to freshen, and haul more from the southward to the westward. At about seven o'clock a. m. the steamer passed Outer Island, then the usual distance off, as 'near as this could be judged. The steamer continued on the east-northeast course with the wind hauling more and more to the westward, and constantly freshening, the atmosphere still being thick with smoke. As the wind freshened, the sea increased. At about four o'clock p. m. the course was changed to north-east by east, which course would take the vessels well clear of Eagle Harbor, or Kewenaw Point. At six o'clock p. m. the course was changed still more to the northward, as the wind was still increasing from the westward. The atmosphere was becoming thicker with smoke. This was done as an extraordinary precaution to give ample sea room in which to pass clear of Eagle Harbor. And the course was then further changed to the northeast, and the vessels continued upon this course until about eight o'clock, when the steamer, still on the northeast course, slightly touched bottom, and, fearing that she was too close to the land, her helm was immediately hove hard a-starboard, and her whistle blown two blasts as a signal for the vessels to also starboard their helms. This signal of two blasts was immediately succeeded by other short blasts of the whistle as an alarm signal to the barges, and to apprise them of the fact that prompt obedience to the signal of the two blasts was necessary. The barge Aloha promptly obeyed the signal, and without difficulty, under her starboard helm, followed the said steamer, while the schooner J. H. Mead did not obey the said signal, and did not starboard her helm, but, on the contrary, as claimants are informed and believe, in direct opposition to the said signal, ported her helm, and by so doing parted the towline between the Aloha and the Mead; all of which occurred without the knowledge of those in charge of the steamer Kalkaska until some time after it had occurred. That, soon after the alarm signals had been blown, inquiry was made by those on the Aloha as to her condition, and her master reported that she was leaking badly, and requested the steamer to proceed at once to take her to a place of safety. That thereupon the master of the said propeller, fearing that the Kalkaska would be unable to render any assistance to the schooner Mead and Mediator, and realizing the fact that both carried sails, and were of light draft, and therefore quite able to take care of themselves, continued with the Aloha in tow for the port of Sault Ste Marie."

The captain of the Kalkaska states his action, in substance, as follows: When the steamer and tow were about four miles off Devil's Island, about 4:30 a. m. of the 18th, the wind was blowing some, freshening, and, the weather being very hazy, the course of the vessel was changed to east-northeast, the chart course being, according to his statement, east by north half north. He steered a point to the northward, as he states, because the variations of the compass drew him to the eastward a half a point. He thus proceeded, the vessel and the tow making about eight miles an hour, until 4 o'clock in the afternoon, when the course was changed to northeast by east. The weather was very smoky, obscuring objects either on land or lake. "We

could see our tow good, but that was all we could see." And from the time of passing Outer Island at 7 o'clock in the morning they saw no land or lights, other than the lights of the tows, until the tows were stranded. At 4 o'clock the wind and the sea were making all the time. The wind constantly freshened from the northward and westward; the Aloha carrying her reefed foresail and staysail, the Mead a foresail and headsails, the Mediator a staysail. He states that the course was changed to northeast by east because "I could see that my tow was drifting, the wind was breezing up, and getting more on our port side, and we were drifting down all the time towards the land." At quarter after 6 of that evening the course was changed to the northeast half east because, as he states, "The wind was freshening all the time, and we was falling off, to make up for what we would drift." About 7 o'clock the course was changed to northeast, the atmosphere being very dark and very smoky, and from the Kalkaska could be seen the lights of the tows, but nothing else. At about 8:30 the Kalkaska struck bottom, being then on a northeast course. Then the wheel was put hard a-starboard, and two blasts of the whistle were blown, followed by four or five short toots as a danger signal. The steamer, obeying her helm, swung to port, heading around about northeast by north, and the engine was checked down. The movements of the tows in response to the signals to starboard were as follows: The Aloha, responding to the signals, starboarded her helm. The vessel struck, but minded her wheel, and she swung up to port. After getting clear, it was discovered that the vessel was leaking, and she signaled the master of the steamer that the other tows were gone, and the Kalkaska, with the Aloha, proceeded alone to the "Soo." The Aloha struck on the keel, and split it, and the men were kept at the pumps during the night, and until her arrival at the "Soo." The signal to starboard does not seem to have been heard by those upon the Mead, but the distress signals were. A sailor immediately went forward to see to the towline, and on arriving at the forecastle head he saw the towline slackened; and the Aloha was "right close by us." In fear of collision, he called to the captain, "We are going right on top of her!" and the captain ordered the wheel hard a-port, and directed the sailor to try the lead. "So I ran aft, where the sailors keep the lead, and I throwed my lead out, and just as I had the two-fathom mark in my hand the schooner struck the bottom," and swung off to eastward before the wind. The Mediator was coming up on the starboard quarter, and the captain of the Mead called to the Mediator, then 20 to 30 feet away, to keep off; but the latter vessel came upon the Mead, striking her forward of the mizzen rigging on the starboard side, a glancing blow. The towline of the Mediator was cast off from the Mead just before the collision. The two blasts of the whistle and the subsequent short blasts given by the Kalkaska were heard by the Mediator, and her wheel was put hard a-starboard, and she hoisted her mizzen. When it was about three-fourths up, the Mead notified them to "keep off." Then the captain ordered the wheel a-port, and directed the mizzen to be lowered, and the Mead notified the Mediator that the former vessel was aground. It took about five minutes to hoist the mizzen, the object being to get the vessel up in the wind. The Mediator, after colliding with the Mead, got clear of her, and drifted upon the beach, the Mead being fast on the rocks.

Other essential facts disclosed by the evidence are these: The Aloha was from six to seven hundred feet astern of the steamer, and there was a like distance between each two of the tows. The distance from Devil's Island to a point due north of Eagle Harbor by the chart courses is from 123½ miles to 126 miles, according to the course taken. From the time of passing Devil's Island the steamer and her tows proceeded at full speed of 8 miles an hour up to the moment of the accident. The wind was fresh during the day, varying from the westward to the northwest and the northward, and was blowing about 20 miles an hour. The point where the vessels stranded is a well-known reef of rocks in Lake Superior about 10 miles northeasterly of Portage Lake Ship Canal, and a half mile from shore, and about 16 miles southwesterly from Eagle Harbor. At 4 p. m., when the course was changed to northeast by east, the tow had proceeded a distance of about 90 miles, and was then 17 miles or more off her course.

Libels were filed by the owner of the Mediator and by the owner of her cargo to recover of the Kalkaska the damages sustained. There were decrees in the court below for the libelants, from which this appeal is taken.

Charles E. Kremer, for appellant.

John O. Richberg, for appellee.

Before WOODS, JENKINS, and GROSSCUP, Circuit Judges.

JENKINS, Circuit Judge, after the foregoing statement of the case delivered the opinion of the court.

An engagement to tow imposes neither an obligation to insure nor the liability of a common carrier, but it does demand that the engagement shall be met "with that degree of caution and skill which prudent navigators usually employ in similar service." The Webb, 14 Wall. 406, 20 L. Ed. 774; The J. P. Donaldson, 167 U. S. 599, 17 Sup. Ct. 951, 42 L. Ed. 292. The tows were under the supreme control of the Kalkaska so far as to enable her to fulfill her contract of towage, and they had the right to demand in the towage the full degree of caution and skill employed by prudent navigators. Although, it may be said, the burden is upon the one alleging breach of contract of towage to show negligence or unskillfulness to his injury in the performance, still in some cases "the result is a safe criterion by which to judge of the character of the act which has caused it." The Webb, supra. Here is a remarkable occurrence. In no storm, with a wind at no time exceeding 20 miles an hour, along a well-known coast, and in going a distance of not over 100 miles, the Kalkaska and her tows are at least 17 miles out of their course, and eventually each of the vessels strike the bottom, the Kalkaska and her tow, the Aloha, getting free, the latter in a leaky condition, and the other two tows are wrecked. The atmosphere, it is true, was filled with smoke from the burning woods of Michigan, but that fact neither accounts for nor excuses the disaster. To what cause can the stranding of these tows be attributed? It is urged on behalf of the Kalkaska that she was navigated with all prudence and skill, and that the disaster was caused by inevitable accident, and, as suggested by counsel, by some unknown current which imperceptibly carried these vessels upon the rocks. The circumstances of the case cast upon the Kalkaska "the burden of establishing some excuse for the deviation from the usual and proper course." The Webb, supra. It was, therefore, incumbent upon the steamer to show that she was supplied with fit and accurate compass, that her navigation was in all respects careful and prudent, and that the disaster could not have been avoided in the exercise of due care. A brief review of the manner of the navigation of the Kalkaska upon that day may furnish, possibly, a solution of the cause of the stranding. In the first place, we have no evidence of the condition of the ship's compass. It was incumbent, we think, upon the Kalkaska to show that she was furnished with such a compass as is ordinarily used, and that it was in due and proper condition. Her captain states that when off Devil's Island at 4:30 o'clock in the morning of the 18th, the wind freshening, and the weather being very hazy, the course of the vessel was changed to the east-northeast, the chart course

being east by north half north. This course, he states, would take the vessel about 4 miles north of Eagle Harbor, a distance of 123½ miles. He states that he thus shaped his course one-half a point to the northward of the chart course because the variation of his compass drew the vessel to the eastward half a point. He did not allow for deviation, or for the natural drift of the tow to the leeward. With the steamer loaded with lumber piled 14 feet above the rail, and the tows similarly laden, proceeding on a course east-northeast, and with a wind varying from west to northwest, of 20 miles an hour, there would naturally be a drifting of the vessel and her tows to the leeward. In prudent navigation that should be allowed for, but does not appear to have been done. The steamer, with her tows, proceeded until 4 o'clock in the afternoon, at the speed of 8 miles an hour for the space of eleven hours and a half. According to the captain, the sea was making all the time, and the wind constantly freshened from the northward and westward. The captain states that he then could see that the vessel was drifting, "and we were drifting all the time towards the land," and he then first changed the course to northeast by east. The steamer and her tows had at that time proceeded about 90 miles, and must have been about 30 miles southwesterly of the rocky reef upon which they ultimately stranded. It is wholly unexplained why the captain at that hour could see that the tow was drifting, and could not have noticed the fact before that hour. It was his duty to have been watchful and vigilant in that regard. Prudent navigation demanded such care, and we are wholly unadvised by the record of any reason preventing earlier discovery of the fact. But, even at this late hour, when he perceived that his vessel and tows "were drifting down all the time towards the land," it was not prudent navigation merely to change his course to northeast by east without taking measures to ascertain where he was, and whether he was in the presence of danger. The atmosphere was obscured by smoke, so that he was unable to see a distance of half a mile. That fact imposed upon him the duty of other precaution. He had no right to take it for granted that such change of course would be sufficient. He should have cast his lead. It was his duty to proceed under check, sound, and ascertain his position. The chart declares that in the vicinity where the vessel must then have been there was not over 60 feet of water. Had he done so, he would have ascertained the proximity of danger, and could have avoided the disaster. At a quarter after 6 he changed his course to northeast half east, and about 7 o'clock changed to northeast, as he states with the purpose "to make up for what we would drift." He thus proceeded without making any soundings, and without checking speed, but with knowledge that they were drifting towards the land, until 8:30 o'clock, when they struck bottom, when, as the answer gravely asserts, "fearing that she was too close to the land," the helm was put hard a-starboard, and two blasts of her whistle sounded as a signal to her tows to starboard, and this followed by an alarm of danger. We need not pursue the inquiry. There was here manifest unseamanship and failure to exercise due care and prudence in navigation. It does not need that we should

grope in the realm of imagination to find some occult and unknown current to account for a disaster which is plainly attributable to faulty navigation.

It was urged on behalf of the Kalkaska that the disaster was caused by the neglect of the Mead to respond to the signal to starboard her helm. We cannot sustain this contention. Almost immediately upon giving the signal, the Aloha grounded, and was pulled off by the steamer. The Mead followed, with the towline between her and the Aloha parted, presumably by the strain of the vessels ahead, covering the distance of 600 feet in less than a minute, grounding upon the rocks. The Mediator, while responding to the signal, changed her course upon demand of the Mead to avoid an imminent collision. These vessels were in immediate danger through the wrongful act of the Kalkaska, and we cannot say that in the confusion of a sudden emergency, caused by the fault of the Kalkaska, they should be held in fault for failure to adopt the most prudent measures for safety. It is by no means clear that the promptest obedience to the signal would have enabled either the Mead or the Mediator to escape. The towline of the former was parted, and she was almost upon the reef. She had not, as had the Aloha, the assistance of the steamer to enable her to change her course speedily, or to pull her off the rocks. We cannot think the maneuver of these two vessels in extremis, and in the presence of impending peril, can be allowed to excuse the fault of the Kalkaska, even if different action might possibly have avoided or lessened the extent of the disaster. The decrees are affirmed.