## THE LEADER.

(District Court, W. D. Pennsylvania.   September 23, 1910.)

### No. 5.

1. TOWAGE (§ 4*)—RELATION AND DUTIES OF TUG TO TOW—LIABILITY FOR INJURY TO TOW.

One engaging to perform a towage service is neither an insurer nor a common carrier, and his obligation is only to use reasonable care and diligence and ordinary skill in the performance of the work.

[Ed. Note.—For other cases, see Towage, Cent. Dig. § 4; Dec. Dig. § 4.*]

2. TOWAGE (§ 11*)—INJURY TO TOW—NEGLIGENCE OF TUG.

Libelant, a dredging company, engaged respondent's steamer to tow its dredge and two scows down the Ohio river from one place of work to another. The water was low, and the tow only proceeded after a consultation between the officers of libelant, who were on board the dredge, and the captain of the steamer, which was in charge of a competent pilot. The dredge and scows were placed in front of the steamer, and while proceeding the dredge, which was in front, struck some obstruction under the water, the nature of which was not known, and was injured. *Held*, that the risk from the low stage of the water was assumed by libelant, and that the evidence was insufficient to show that the injury to the dredge was due to any negligence on the part of the steamer, which rendered her liable therefor.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.*]

3. ADMIRALTY (§ 62*)—CROSS-LIBEL—SEPARATE SUITS.

A separate suit, filed by the owner of a steamer against a dredge to recover for towage and for services rendered in raising the dredge after she had sunk, cannot be treated as a cross-libel in a pending suit by the dredge owner against the steamer for injury to the dredge through alleged negligent towing.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. § 507; Dec. Dig. § 62.*]

In Admiralty.   Suit by the Enterprise Contracting Company against the steamer Leader; S. W. Carpenter, claimant.   Decree for respondent.

L. C. Barton, for libelant.
Albert Y. Smith, for respondent.

ORR, District Judge.   The libelant seeks to recover damages for injuries to a tow, alleged to be the result of negligence on the part of respondent and her officers, who were doing the towing.

It is proper to consider first the measure of duty arising from towage service.   In Steamer Webb, 14 Wall. 406, 20 L. Ed. 774, Mr. Justice Strong says:

"It must be conceded that an engagement to tow does not impose either an obligation to insure or the liability of common carriers. The burden is always upon him who alleges the breach of such a contract to show, either that there has been no attempt at performance, or that there has been negligence or unskillfulness to his injury in the performance. Unlike the case of common carriers, the damage sustained by the tow does not ordinarily raise a presumption that the tug has been at fault. The contract requires

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

no more than that he who undertakes to tow shall carry out his undertaking with that degree of caution and skill which prudent navigators usually employ in similar services."

The degree of diligence is stated in the cases to be "reasonable diligence," and the degree of skill is stated in the cases to be "ordinary skill." See The W. H. Simpson, 80 Fed. 153, 25 C. C. A. 318; The Samuel E. Bouker (D. C.) 141 Fed. 480; The Winnie, 149 Fed. 725, 79 C. C. A. 431; The Oak, 152 Fed. 973, 82 C. C. A. 327. It is necessary, therefore, to consider whether or not there is sufficient evidence on the part of the libelant to sustain the burden imposed upon it; in other words, whether the evidence produced satisfies the court that the respondents were wanting in reasonable diligence and ordinary skill, and that by reason of such want the injury complained of resulted.

The libelant is a corporation owning a dredgeboat called the Enterprise and two scows, which had been at work at Sewickley, above lock No. 6 on the Ohio river, and were needed at lock No. 11 on said river, some miles below Steubenville, where the libelant had undertaken to perform a contract. An arrangement was made whereby the steamer Leader should tow said Enterprise and scows from Sewickley to the place where they were required. Accordingly, on the 31st day of October, 1909, the steamer Leader left Sewickley with the dredgeboat and scows in tow. In making up the tow the two scows were lashed to the head of the steamboat, and the dredgeboat was lashed to the head of the scows, with her dredge or dipper hanging over the scows. The end of the dredgeboat next to the scows was the perpendicular end or bow of the boat. The other end of the scows was the rake end, the latter being the stern, so that, as the tow proceeded, the rake end or stern of the dredgeboat was forward. No question is raised as to that arrangement. The men in charge of the dredgeboat, representing the libelant, remained thereon until the time of the accident. They were Albert Klicker, the president and general manager, Charles Austin, vice president of the corporation and captain of the boat, Frederick Weaver, watchman, and several other employés. The steamer Leader was fully manned and in charge of a skillful and licensed pilot. It was apparent to any person acquainted with the river that the water was low. According to the testimony of Klicker, the dredgeboat and steamer needed the same amount of water and the dredgeboat required 3½ feet. The steamer and its tow left Sewickley at noon, and proceeded as far as dam No. 6. Klicker says there were only 2.2 feet of water below the dam, which was not enough to proceed with, and there did not seem to be any possibility of getting down the river. They tied up and waited until the next morning, when, according to Klicker, there were 4.2 feet of water. This additional water below the dam appears to have been due to the lowering of several wickets in the dam. There was a consultation between Klicker, Austin, and Capt. Keller, the pilot of the steamboat, with regard to the possibility of getting through. The two former seemed to be anxious to get their boat down, and the latter was willing to proceed, and the result was that they decided to go ahead, and they left dam No. 6, according to the testimony of Austin,

at 3:50 p. m. on November 1st. They all knew they had very little water. Weaver testified that Austin remarked, after leaving lock No. 6, "We have scant water." He further says that the men on the dredgeboat expected something to happen. A few hours later, when near Phillis Island, the rake end of the dredgeboat struck something, and the dredgeboat was so injured and damaged that she filled and sunk. No one seems to know what it was the dredge struck. Austin says he does not know what the dredgeboat hit. Klicker does not know whether the boat hit upon rocks or some other obstruction. The character of the injury suggests its cause. The bottom of the dredgeboat consisted of planks laid crosswise. A number of these planks were injured and broken. The breaks in the planks were all upon a line practically parallel with the side of the dredgeboat. It is probable that an obstruction was hit by the dredgeboat as it was moving, and perhaps was rolled under the boat breaking the successive planks. What it was no one knows, or at all events has not informed the court. The steamboat laid by the dredgeboat and assisted in pumping her out, after the owners of the dredgeboat had made repairs. On the 5th of November the steamer and her tow reached Midland, a few miles below the place of the accident. Austin says they laid at Midland from the 5th to the 12th of November for want of water, and on the night of the 12th of November they got a slight raise, and the next morning they started for Steubenville, and got there that night. From that point the owners of the dredgeboat allowed her to drift down to lock No. 11. That is practically all of the evidence of negligence, saving and excepting some as to the seamanship of Capt. Keller of the Leader.

I am of the opinion that the evidence discloses that the owners of the dredgeboat assumed the ordinary risks of navigation arising from the low water in the river. They knew that the shallower the water the nearer its surface would be unknown and unexpected obstructions. The evidence is clear that there was nothing on the surface of the water to indicate the obstruction against which the dredgeboat struck. Had the dredgeboat been thrust against the bank or a visible obstruction to navigation, or been grounded upon a bar, then, notwithstanding the low water, the respondents might be answerable in damages for their want of seamanship.

The evidence produced on the part of the libelant for the purpose of showing bad seamanship of Capt. Keller is uncertain and indefinite. It rests largely upon the testimony of a discharged employé, who was engineer on the steamer at the time of the accident, to the effect that when there was a jar felt by him, then, although they had been working ahead on a slow bell, the pilot immediately gave him bells to go ahead at full speed. In this he is contradicted by the fireman, who was near him at the time, and by other evidence which satisfies the court that the steamer was backing to steady its tow, as it was proceeding with rapid current. Some other evidence was offered tending to show that the pilot of the steamer did not have his steamer and tow at the proper angle in order to enter and pass through the channel; but the evidence is wholly insufficient for that purpose. It is very doubtful whether any of the parties connected with the li-

belant believed at the time of the accident that the respondent or anybody connected with her was negligent. It appears from the testimony of the secretary of the libelant that the libelant after the accident paid Capt. Carpenter, the owner of the steamboat, moneys due for other services, and when Capt. Carpenter presented his bill for towage did not say to him that they had a defense or a counterclaim by reason of the damages done to the dredgeboat. The dispute with respect to the bill for towage was with regard to the amount, and that only.

After a careful consideration of the evidence, the court is convinced that there was no negligence on the part of respondent.

At the argument it appeared that at No. 8 of May term, in this court (infra), S. W. Carpenter, the owner of the steamboat Leader, had filed a libel against the dredgeboat Enterprise, its master and owner, and it was argued that such libel was a cross-libel in the present case. The court cannot so consider it. A cross-libel is filed in the same proceeding as the original libel, and even an agreement of counsel will not permit that to appear as a cross-libel which is not in fact such. See Ward et al. v. Chamberlain; 62 U. S. (21 How.) 572, 16 L. Ed. 219. But, even if a libel filed at another number and term might by agreement and the permission of court be treated as a cross-libel, it could not be so treated if the matters in the pretended cross-libel were not the proper subject of a cross-libel. Carpenter in his libel seeks to recover for towage and for diving expenses in the matter of raising the dredgeboat. That these are not proper matters of cross-libel in such case as the present appears from a consideration of The Teresa Wolf, 4 Fed. 152, C. B. Sanford, 22 Fed. 863, and Southwestern Transportation Company v. Pittsburg Coal Company, 42 Fed. 920. The matters in the pretended cross-libel, particularly the claim for diving, are distinct from the matters in the present controversy.

As to the libel of Carpenter, the court has this day disposed of that in the proper proceeding. As for the libel in this case, the same should be dismissed, at the cost of the libelant.

Let a decree be drawn accordingly.