### THE RAVENSCOURT.

### THE TYEE.

### THE COLUMBIA.

(District Court, D. Washington, N. D. August 10, 1900.)

1. TOWAGE—IMPLIED CONTRACT.

The captain of the C., having applied to the manager of a tug for the towage of his vessel to sea, was informed that the tug was under contract to tow the vessel R. the next day, and that, if the latter was not ready, it would take the C., but that, if the two vessels were ready, it would tow both. The next day, the R. being ready, the captain of the C. was informed of the orders of the tug to take both vessels, and, although he expressed dissatisfaction, he signed an order for the payment of the towage money, and voluntarily took on board the tug's hawser, and made

it fast to the C.'s foremast. *Held*, that there was an implied agreement that the C. was to be towed in company with the R.

**2. SAME—NEGLIGENCE—COLLISION—EVIDENCE.**

It appearing that the hawser by which the C. was towed was comparatively new; that it had been thoroughly tested, and found sufficient to sustain a strain many times greater than that required to tow the C.; that it was carefully inspected at the time of being passed to the C.; and that aside from the fact that the towline broke, there was an entire failure of proof of any fault on the part of the tug in furnishing a defective hawser, —the owners of the tug are not liable for damages sustained by the C. in a collision with another vessel being towed by the same tug, which occurred through the breaking of the hawser.

**3. SAME.**

The only evidence of the bad steering of the R. being that of the mate of the C., who was in bed at the time of the maneuvers which caused the collision, that the R. was steering wildly, because she was sometimes astern of the C. and sometimes well off her port quarter, while the officers of the R. testified positively that they were alert, and constantly observing the tug ahead of them, and following her, and that they observed the signals given by the tug when she changed her course, the evidence is insufficient to show that the collision of the two vessels was caused by the negligence and bad steering of the R.

**4. SAME.**

The tug towing the vessels in question, having occasion to change her course to starboard because of a light ahead, signaled the vessels that she was about to change, and for them to follow, and after a few minutes made an irregular signal, and changed back to her regular course. The officer in charge of the C., not understanding the signals, ordered the helmsman to port the wheel, as he went forward to see what was going on, and on his return assisted in setting the wheel hard a-starboard, with the result that the vessel sheered to starboard in a manner to cross the towline of the R., and then took a sheer to port, immediately after which a jar was felt on the tug, the towline of the C. parted, and within a minute or two the bow of the R., which was on the longer hawser, struck the C.'s port quarter near her mizzen rigging, causing serious damage to both vessels. *Held* that, the bad steering of the C. being the only charge of negligence that was sustained by the evidence, that vessel was liable for the damage done to the R.

In Admiralty. Suits in rem to recover damages for injuries to the American ship Columbia and to the British bark Ravenscourt, caused by a collision between the two vessels while both were being towed to sea by the steam tug Tyee, owned and operated by the Puget Sound Tugboat Company. Hearing on the merits. Decree in favor of the Ravenscourt.

Metcalf & Jurey, for the Columbia.
Preston, Carr & Gilman, for the Ravenscourt.
Struve, Allen, Hughes & McMicken, for the Tyee.

HANFORD, District Judge. In the first of these cases the owners of the American ship Columbia claim damages for injuries to their ship, sustained in a collision with the Ravenscourt, while the two colliding vessels were being towed out by the steam tug Tyee, and their suit is in rem against both the Ravenscourt and the tug. Their libel charges that a contract for towing the Columbia singly was violated by the captain of the tugboat in attempting to tow two vessels. As to this first disputed question in the case, I find from the evidence that the terms of the agreement for the towage of the Columbia

were not reduced to writing, and the only contract between the parties arises by implication from the previous dealings between the captain of the ship and the tugboat company, the knowledge of each party as to the different vessels, the rates of towage, the rules and regulations of the tugboat company, the customs on Puget Sound relating to the towage of vessels, a short conversation between Capt. Nelson, master of the 'Columbia, and Capt. Libby, manager of the tugboat company, the conduct of Capt. Nelson in voluntarily permitting his ship to be towed in company with the Ravenscourt, and in giving to the captain of the Tyee a written order for the payment of the price of the towage services, and the acts of the master of the tug in taking the two vessels in the harbor of Tacoma, and proceeding with them towards the sea. The conversation between Nelson and Libby was too vague and indefinite to constitute a contract. According to a preponderance of the evidence, Capt. Nelson sought Capt. Libby, and requested to have a tug tow his ship to sea the following day if she finished loading in time. He stated that he expected to be ready by noon, but could not be certain that a sufficient quantity of coal to complete her cargo could be obtained in time. Libby informed him that the Tyee was being held to tow the Ravenscourt the next day. Nelson asserted that the Ravenscourt would not be ready, and to that Libby responded that, if the Ravenscourt were not ready, the Tyee would go to sea with the Columbia if she were ready, and he would send for another tug to take the Ravenscourt; but, in case both vessels were ready to be towed, as expected, the Tyee would take them both. The next day after this conversation both vessels were ready to go to sea, and the captain of the Tyee received orders from Capt. Libby to tow them both, and he informed Capt. Nelson what his orders were before taking the Columbia from her moorings. Capt. Nelson expressed dissatisfaction, but nevertheless signed and gave to Capt. Bailey a draft or order for the payment of the towage money, and voluntarily took on board the Tyee's hawser, and made it fast to the Columbia's foremast. The Tyee had ample power to tow two vessels of the size and class of the Columbia and Ravenscourt in Puget Sound, and it has been a common practice for tugboats to tow two or more vessels together. Capt. Nelson, knowing that the Ravenscourt had a prior claim to the service of the Tyee, was put to his election to be towed at that time in company with the Ravenscourt, or to wait until another tug could be obtained; and by accepting the service that was offered he voluntarily encountered the additional hazard obviously involved in the towage of his vessel in company with another ship. From the facts and circumstances there arises by necessary implication an agreement by the terms of which the Columbia was to be towed in company with the Ravenscourt. The vessels were towed by separate hawsers, the Columbia's towline being about 120 fathoms in length, and the Ravenscourt was towed by a hawser 180 fathoms in length, so that the two ships could not possibly have come in collision with each other while both towlines were intact and the tug was under way. The Columbia's towline, however, was broken, and the collision occurred while she was adrift; and the second ground of complaint against the steam tug is that the hawser

furnished by the tug, and with which she was towing the Columbia, "by reason of its defectiveness" parted, and left the Columbia adrift and helpless, immediately in the course of the Ravenscourt. Except the fact that the towline did break, there is an entire failure to prove any fault on the part of the tugboat company in furnishing a defective hawser. On the contrary, the evidence shows that the hawser was comparatively new, having been in use for a period of time not exceeding one-fourth the ordinary lifetime of such a hawser when subjected to usage common with Puget Sound tugboats. It had been subjected to a most thorough test, and found sufficient to sustain a strain many times greater than the strain it would have to bear in towing the Columbia in the waters of Puget Sound in ordinary weather if the Columbia were properly steered, and it was carefully and thoroughly inspected by the first mate and a quartermaster on board the Tyee at the time of being passed out to the Columbia, so that if it were cut or chafed or unduly worn in any place the defect should have been discovered; but no defect was observed or known.

The next charge in the Columbia's libel is that the Ravenscourt was steered badly, and that immediately before the collision, by reason of negligence and bad steering on board the Ravenscourt, that vessel veered from her true course so as to cross the wake of the tug, and bring her hawser afoul of the Columbia's rudder, so interfering with the navigation of the Columbia that she could not be steered properly; and the libel charges that, if the master of the tug had been attentive to his duties, he should have known that the Ravenscourt was out of her course, and should have prevented the bad steering on her part. This part of the libel charges both the tug and the Ravenscourt with a fault in permitting the Ravenscourt to veer from her course, which fault was the direct cause of the disaster. This particular ground of complaint must be considered in connection with the counter charge contained in the libel filed by the owner of the Ravenscourt. The owner of the Ravenscourt has made no complaint against the tug, her master, or her owner. His suit is in rem against the Columbia, and in his libel he charges that the accident was due entirely to bad steering on the part of the Columbia. The main controversy in the case, therefore, is with reference to the particular movements of the colliding vessels immediately before the collision. The general facts as to which all witnesses agree substantially are that the tug started with the vessels in tow from Tacoma Harbor, at 3 o'clock p. m. on the 22d day of January of this year, the Columbia being towed by a line leading from the stern of the Tyee through a chock on the starboard side of her bow to her foremast, the length of the line between the stern of the Tyee and the bow of the Columbia being a little more than 100 fathoms. The Ravenscourt was towed by a line 180 fathoms in length, all of which was paid out, leading from the stern of the Tyee to a chock on the port bow of the Ravenscourt, and made fast to her towing bitts forward of the foremast. The towlines being so arranged, the vessels, when steered to follow the tug, would have kept a safe distance from each other. The Columbia, being on the port side, would have kept the tug in view over the starboard side of her bow with the Ravenscourt astern, and off her starboard quarter; and the Ravens-

court, being on the starboard side of the Columbia, with her towline leading through the port chock, should have kept the tug in view over her port bow. The vessels proceeded without any occurrence worthy of notice until after 6 o'clock p. m. they had proceeded nearly 25 miles, and were off Alki Point. It was then dark and raining, with a fresh southerly breeze and an ebb tide, the wind and tide being favorable to the progress of the vessels on their course. At that time a bright light was seen off the port bow of the tug, and immediately after one or more other lights were seen, which the captain of the tug at first supposed were the lights of a tug having a tow, and, not being able to make her out exactly, he blew several blasts of his whistle as a warning to the ships in his wake that he was about to change his course, and for them to follow. At the same time the tug changed her course, going to starboard. After a few minutes the light ahead was discovered to be on a sailboat going in the same general direction, and thereupon the tug again made an irregular signal by blowing several blasts of her whistle, and changed back to her regular course. Within a very few minutes after the tug came back on her course the Columbia's towline parted, and within a minute or two afterwards the Ravenscourt came in collision with her, the stem of the Ravenscourt striking the Columbia's port quarter somewhere near her mizzen rigging, causing serious damages to both vessels. The tug signaled the Ravenscourt to drop her towline, and, as soon as both towlines could be drawn in and taken aboard the tug, she went to the relief of the disabled vessels, and, after extricating them from each other, the Ravenscourt was first taken in hand, and towed to an anchorage, during which time the Columbia drifted a distance of five or six miles, and had passed West Point lighthouse when she was picked up by the Tyee, and towed to an anchorage at Port Blakely. The only evidence of bad steering or faulty management on the part of the Ravenscourt comes from the officers and men on board of the Columbia, who were not in the best position to observe the handling of the Ravenscourt, and the evidence convinces me that they paid very little attention to her before the time of imminent peril. The principal witness against her is Mr. Wilson, mate of the Columbia, who was in bed at the time of the maneuvers which caused the collision. The testimony of this witness appears to have been given in a free and good-natured manner, with very little regard to accuracy. He stated that he noticed that the Ravenscourt was steering wildly, because she was sometimes astern of the Columbia, and sometimes well off her port quarter. This might be true if, in fact, the Ravenscourt had been kept on her course in the wake of the tug, and the Columbia had been permitted to veer. The officers and mate on the tug give no evidence of bad steering or negligence on the part of the Ravenscourt, while the captain and officers of the latter vessel show by their positive testimony that they were alert, and constantly observing the tug ahead of them, and following her. They observed the signals given by the tug, and when she changed her course to starboard the Ravenscourt went to starboard, and came back on her course immediately after the tug came back. I reject the testimony of Capt. Scott and the witnesses for the Ravenscourt with reference to the movements and positions

of the Columbia, for the reason that they appear to me to be improbable. As an illustration of the unreliable character of this evidence, I refer to the statement of Capt. Scott that before the collision he observed by the phosphorus at the stern of the Columbia that she was drifting astern. This I regard as impossible, because without any strain upon her towline her momentum and the wind and tide combined would carry her forward on her course, as in fact she drifted after the collision. Capt. Bailey and the other witnesses who were in the tug appear to be candid and careful in their statements, and they agree that after the maneuver of the tug above referred to the Columbia sheered to starboard in a manner to cross the towline of the Ravenscourt, and then took a sheer to port, and immediately after a jar was felt on the tug, and the captain found that the Columbia's towline had parted. This testimony in regard to the conduct of the Columbia in going off to starboard and swinging back again after the tug had come back on her course is corroborated by the lookout on board the Columbia, and several others of the Columbia's crew, and they attribute these extraordinary movements of the Columbia to the bad steering of their ship. Against this strong evidence condemning the Columbia there is practically nothing. Capt. Nelson was in his cabin until he became aware that his vessel was in peril by hearing the sound of the Ravenscourt's hawser striking or scraping on the starboard side of his ship. He did not hear the tug whistle, and when he came on deck he was told by the second mate and the man at the wheel that the wheel was hard a-starboard, but the vessel would not respond to her helm, because the rudder was held rigid by the strain of the Ravenscourt's hawser against it. Of course, being in the cabin at the time the vessel sheered from her true course to starboard and then to port, he does not attempt to testify as to how the vessel had been steered. The second mate was in command of the deck from 6 o'clock until the captain came out immediately before the collision. He heard the tug whistle, and, not knowing what was meant, went from his station aft to the forward part of the ship, to observe what might be going on, and then returned, and was standing by the man at the wheel when the captain appeared. During his movement from aft to forward he ordered the helmsman to port the wheel, which order was possibly executed in a manner to cause the vessel to sheer off at an angle from her course. He does not show, nor does the man at the wheel state, what was the effect of his order. That the effect was to cause the ship to veer from her course to starboard, and put her in a bad position, may be fairly inferred from the action of the second officer on returning to his station aft, for by his testimony he shows that he then assisted the helmsman to set the wheel hard a-starboard, in which position it was being held when the captain came on deck. The most convincing evidence of the Columbia's fault is in the manner in which the vessels came together. She must have lain across the path of the Ravenscourt, with her port side towards the Ravenscourt, because her port quarter was struck by the bow of the Ravenscourt. That is just the position she would be in after running away to starboard and being brought around quickly. On the other hand, if the Columbia kept her position, and followed the tug, the

Ravenscourt could not have struck as she did without going out of her course, to port, a much greater distance than the Columbia would have to go to cross the towline, and then changing to a course at right angles to the course of the tug, or nearly so, with her bow towards the port side of the Columbia. These lateral movements would necessarily have caused some loss of headway and widened the distance between her and the tug, which would have increased the strain upon her towline, and eased the strain on the Columbia's hawser correspondingly; and, even if it were defective, it should not have been pulled apart at that particular moment. The bad steering of the Columbia was undoubtedly the cause of her being under foot of the Ravenscourt when her hawser parted, and probably by swinging as she did she fouled the towline of the Ravenscourt, and made it impossible for her to avoid the collision. It is impossible from the testimony to decide with any degree of certainty as to the cause of the breaking of the Columbia's towline. Whether there was a fault on the part of any one in that connection, and, if so, whose fault, cannot be ascertained. There being no evidence of negligence in that regard on the part of the officers, crew, or owners of the tug, she is not to be condemned. The rule settled by the supreme court places the onus probandi on a party complaining of negligence on the part of a towing vessel. The Webb, 14 Wall. 414, 20 L. Ed. 774. The only charge of negligence or fault which could have caused the accident sustained by evidence is bad steering on the part of the Columbia. I am therefore obliged to render a decree against her for the full amount of damages sustained by the Ravenscourt, which, from the testimony, I find amounts to $7,288.35, including demurrage at the rate of $100 per day for a period of 32 days. The suit against the Ravenscourt and the Tyee will be dismissed, with costs.