### THE ANDREW J. WHITE.

(District Court, E. D. New York. March 22, 1901.)

TOWAGE—LIABILITY OF TUG FOR INJURY TO TOW—WRONGFUL ASSUMPTION OF AUTHORITY BY MASTER.

A tug was engaged to perform towage services by the master of a barkentine, which lay at the foot of a slip in which a number of other vessels were moored. The owner of the tug refused to take the tow from inside the slip, and the master of the latter agreed to deliver her at its mouth. When the tug arrived, however, the barkentine had not been brought out of the slip, and the master of the tug gratuitously undertook to bring her out. The undertaking was dangerous, and was not executed with proper care on the part of either vessel, in consequence of which the barkentine came in collision with another vessel in the slip, and was injured. *Held*, that after the refusal of the owner of the tug to undertake the service, which was known to the masters of both vessels, the master of the tug had no authority to bind her, or to subject her to liability, by wrongfully undertaking it, and that the attempted maneuver was therefore at the sole risk of the tow.

In Admiralty. Suit against a tug for injury to her tow from collision.

Black & Kneeland, for libelants.
James J. Macklin, for claimant.

THOMAS, District Judge. The tug Andrew J. White attempted to take the barkentine Minnie out of the slip between the Twenty-Sixth and Twenty-Seventh street piers, Brooklyn, N. Y. The latter collided with a scow. Hence the injury which is the subject of the libel. The first necessity is to understand the slip and its incumbrances, which the following diagram shows approximately:

Distance from inner end of scow to line drawn from stern of Minnie, approximately 225 feet; distance from inner end of steamer to same line, approximately 160 feet; distance from inner end of steamer to scow, 60 feet; distance from stern of Italian bark to stern of Minnie, approximately 200 feet; distance from inner end of scow to stern of Italian bark, 40 feet; clear space outside of scow for passage, approximately 50 feet.

There were other vessels in the dock, but no attempt is made to accurately place any save the fishing vessel, Minnie, Italian bark, steamer, scow, and, tentatively, the Norwegian bark. The evidence respecting the last-named vessel is contradictory, but on the diagram it is placed as far abaft the Italian bark as any evidence in the case justifies. The widths of some of the vessels are not given in the evidence, but the smallest dimension is adopted compatible with the nature or known length of any particular vessel. There is slight evi-

dence that the slip was 100 feet wide, but the width of 120 feet is here adopted as more probably correct. If the relations of the several vessels in the slip as above given be deemed unsatisfactory, yet any other arrangement consonant with the evidence of either party should lead to the same conclusion.

The problem was to pull the Minnie's stern from under the bow of the Italian bark, thereupon adjust her course during the distance of 220 feet, so that she would pass clear of the scow and obstructions on the opposite side, and pass through the narrow openings exhibited above. The passage was possible, under very nice adjustments, if duly executed pursuant to careful precautions. As the libelants' counsel states in the presentation of another feature of the case: "The barkentine was being towed out of a narrow and incumbered slip, where care was necessary, and any disobedience of orders was certain to cause embarrassment, if not disaster." The highest care was necessary. The slightest negligence in preparation or execution of orders, any deviation from the right course, even slight acceleration of speed beyond that just suitable, the failure of the tug to go to port at precisely the right instant, the failure to order down the anchors at the very exact moment required, or to obey such order with accuracy, would lead to collision and injury. The evidence illustrates all this. The headline that was to check the speed of the Minnie was thrown off when it ran out, or, as some of the witnesses for the Minnie stated, long before it ran out, if the length ascribed to it by the captain of the Minnie be accepted. There was nothing there to check the vessel's speed. The captain of the tug claims that he supposed that it would not be thrown off: that he directed it not to be. But when he discovered that it had been, and that he was in a dilemma, he did not at the instant order the anchor down, but directed a line from the barkentine to the Italian bark. When he discovered that there was no one on the bark to take the line he ordered down the anchor, but it is probable that the Minnie was so near the scow that the order could not be executed with sufficient quickness to save the contact; at least, it was not. Both parties entered upon a dangerous endeavor. It was unnecessary. The scow could have been moved easily, and the parties interested had power to compel its removal to another berth. It was negligent for either or both of them to undertake this maneuver. Hence, under ordinary circumstances, the damage would be placed on both.

But there is another element in this case that may not be overlooked. It is admitted that on the previous evening the captain of the Minnie made a towage contract with the agent of the owners of the tug, and that the agreement was that the captain of the Minnie should have her hauled down to the mouth of the slip ready for the tug. The evidence shows a practical refusal on the part of the owners of the tug to take the barkentine from inside the slip. Upon the arrival of the tug the next morning to do the work, the captain of the tug states that the following took place:

"Q. Did you have any talk with the captain of the barkentine? A. I says to the captain, 'You should have had this vessel hauled down.' I said, 'Here

is a hard place to get her out of here now.' He said, 'I couldn't get her hauled down, because we didn't get loaded till 7 o'clock last night.' * * * Q: Did you refuse to take him then? A. No; I didn't refuse to take him then. Q. What was said about taking him? A. Nothing was said; we went to work to try to get her out of there."

The situation, then, is that the captain of the Minnie knew that the owner of the tug declined to have the tug draw the barkentine out of the slip, and that the master of the tug, in undertaking the office, assumed to do an act which the owner had declined specifically to allow him to do. And he knew, moreover, or should have known, that the service which she was undertaking required so careful maneuvering as to be dangerous. Hence, the service on the part of the tug was not only gratuitous, but, to the knowledge of the parties immediately participating, it was done against the will of the owner. Undoubtedly, the fact that the service was gratuitous would not preclude liability in case of sufficiently negligent execution of the work; but, where the master of a tug undertakes a service known to him and to the master of the tow to be wrongful as regards the owner of the tug, the doctrine that the act of the master is binding upon the vessel should not be applied. The master speaks authoritatively in the absence of the owner. In this case, the owner had withdrawn that authority by stipulating with the captain of the barkentine that it should not be exercised. Hence the master of the tug was acting as the servant or helper of the captain of the vessel, gratuitously doing a duty which the latter person had undertaken to do as regards the owner of the tug, and wrongfully using his employer's tug in this service. Of course, it is to be considered that the master of the tug might prefer to pull the tow out of the slip rather than to await the slow process of her own crew working her out, but that does not meet the vital objection that he was doing a thing which he had no right to do. He knew this. The captain of the barkentine knew it, and had agreed that it should not be done. This court should not sustain the asserted rule that a captain of a vessel may make a specific contract for towage with the owner of a tug, which carefully excludes hauling from the slip on account of recognized danger, but the master of the tug, on arrival, may annul the provision for taking from the slip, and assume the risk thereof, which his employer has rejected, and which the captain of the tow assumed. The libel is dismissed.