THE OCEANICA.

(District Court, W. D. New York. March 8, 1906.)

1. TOWAGE—INJURY TO TOW—LIABILITY OF TOWING VESSEL.

A steamer towing a loaded barge down Niagara river, which broke a propeller blade on a rock and cast the barge loose, allowing it to drift against a pier, by which it was injured, *held*, on the evidence, in fault for such injury, on the ground that she was outside of the usual and marked channel and where navigation was dangerous for vessels of her draft. The barge *held* not in fault for not dropping her anchor when cast adrift, which, if an error, was one in extremis, in view of her imminent danger from the rapid current.

2. SAME—CONTRACT—AUTHORITY OF MASTER TO EXTEND.

Pursuant to an agreement between the owners of a steamer and a barge, the master of the steamer was instructed by telegraph to tow the barge from Marquette, Mich., to Buffalo. On the trip, a further agreement was made between the masters that the towage should be extended to Tonawanda, nine miles further, which was the destination of the barge. *Held*, that in making such agreement the master of the steamer did not exceed his authority, and that it was valid; the master of the barge having no knowledge of an agreement between the owners, that the towage should stop at Buffalo.

3. SAME—ACTION FOR INJURY TO TOW—NATURE.

An action to recover from a towing vessel, for an injury to her tow through her alleged negligence, is not one for breach of contract, but for a tort.

4. SAME—CONTRACT—AGREEMENT OF TOW TO ASSUME.

A towing vessel is liable for an injury to her tow resulting from her negligence, notwithstanding a provision of the contract that the towing should be at the risk of the tow.

In Admiralty. Action for injury to tow.

Clinton & Clinton, Harvey L. Brown, and John B. Richards, for libelants.

Crangle & Burke, for respondent.

HAZEL, District Judge. On the afternoon of November 25, 1904, the Oceanica, while towing the barge Massasoit from Marquette, Mich., to Tonawanda, N. Y., struck a submerged rock or other obstruction in Niagara river, breaking the blades of her propeller wheel. She cut the tow line and drifted down the river. The Massasoit drifted on Intake Pier, located in the river about 900 feet from the easterly bank. The libel is filed in rem to recover damages sustained by the Massasoit, and charges that the steam barge was navigated carelessly and negligently in not keeping in the channel or in water of sufficient depth for her draft. The answer denies negligence, and alleges that the Massasoit failed to follow in the wake of the steamer; that she kept too far eastward and did not respond to the signals to starboard her wheel. It also alleges that the agreement was to tow the Massasoit from Marquette to Buffalo, and not to Tonawanda, a port about nine miles beyond; and that her master assumed the risks or dangers of towing the barge to the latter port. Further, that in towing the barge to Tonawanda the master of the Oceanica exceeded his authority, and was not acting in the employment or service of the

owners of that vessel. The legal aspects of the towing contract will be discussed later, as it is deemed essential to first attach the blame of the accident.

The Massasoit, which was about 800 tons burden and loaded with lumber, was drawing 14 feet· 5 inches of water fore and aft, and the Oceanica 14 feet 6 inches. The weather was clear. The channel in the river from the mouth of Lake Erie to the point of accident is approximately 700 feet wide. It is marked by two black spar buoys on the starboard side, and two red spar and two can buoys on the port side. There are two ranges high on the bank, one behind· the other. The safe and usual course of navigation down the river from the lake is to steer on the ranges until close to the black spar buoy No. 1, as shown on the government chart. The wheel is then starboarded; the ranges being slightly open to the eastward, and the vessel heading on the port side towards red can buoy No. 2. Another hard astarboard turn of the wheel heads the vessel in a northwest-wardly direction across the river. In this way a loaded vessel or-dinarily proceeds down the river past the Intake Pier. The channel above the Intake Pier is well marked and can be navigated safely by ordinarily prudent navigators; despite the presence of varying strong northeasterly currents. The survey and soundings, as shown on the chart in evidence, indicate the existence of shoals and the depth of water on each side of the channel. It is unsafe and dangerous to navigate boats of over 14 feet draft past the Intake Pier outside the defined channel. This fact is generally known to navigators of Niag-ara river. Departure from the ordinary course by vessels going to the eastward of the black spar buoys on the starboard side, instead of keeping to the middle or within the channel, is apt to·result dis-astrously. Indeed, the testimony of libelants' witness Poor, a river pilot, shows that, even in the defined channel, a vessel drawing 14 feet 6 inches is liable to touch bottom when the water is low in the river. There is evidence tending to show that the Oceanica proceed-ed through the water at such a slow rate of speed that the tow line slackened, making a bight· on the starboard bow of the barge. Al-though the river runs at the rate of six to eight miles per hour just above the Intake Pier, on account of cross-currents to the eastward, it is necessary that a vessel should proceed at a rate of speed cor-responding to the strength of the current. Otherwise it would be taken by force of the water to the eastward out of the channel.

As stated, the preponderance of the evidence is that it was com-monly accepted by navigators of tows and vessels of the draft of the Oceanica that it was necessary to remain on the westerly side of the Intake Pier, and that to proceed easterly thereof involved the risk ·of insufficient water and rocky bottom. According to the tes-timony of Captain Van Dusen, the Oceanica touched bottom or ob-structions several times while proceeding between buoys 1 and 3 in the customary channel. He claims that the steamer was properly navigated in the channel, when she lost or broke her wheel, but of this I am not convinced. If I were satisfied that she had taken the usual and ordinary course down the river at the point where the

accident happened, she should not be held liable. The preponderating evidence establishes that respondents' witnesses are mistaken in their testimony that the wheel was broken in the customary channel. Parrish, an apparently disinterested witness, testifies that he was walking on the bank about half a mile distant from the accident, and clearly observed the approach of the tow near the Intake Pier. He is an experienced river tugman; the duties of his employment requiring him to help tows through the draw of the International Bridge, just below the point of accident. He testified that he watched the tow coming down, and noticed that she was too far to the eastward, and she seemed "ranging around a little." Upon this point he states:

"Q. What do you mean by that? A. First one way and the other. She wasn't steering a steady course. * * * She come down the river—I think she was out of the general run of course. She was over to the eastward farther than they generally go coming down the river there. Q. From where you were, how could you tell that? A. Well, I could tell by the opening she gave the Intake Pier. On the dock where I stood they hardly ever open our place there. You can't see them to the eastward of the Intake Pier from our dock, not if they are where they should be. * * * Q. Was there any danger in the Oceanica's being as far eastward as you saw her? A. Well, I would have been a little uneasy if I had been there myself, I think. Q. And when you saw her over there to the eastward of the ordinary course, what did you do? A. I stood and looked at her till she blowed her whistle."

It is manifest that, by his testimony that the Oceanica was about a thousand feet to the eastward, this witness meant that she was approximately that distance to the eastward of the ordinary course of down-bound vessels.

The claim that the Massasoit was in fault for not dropping her anchor is unpersuasive. It is not clear from the evidence that by casting her anchor she would not have stranded on the Intake Pier. Indeed, it is doubtful, considering the strength of the current, whether the anchor would have prevented her from drifting. In any event, she cannot be held in fault for this omission. Failure to drop her anchor, in view of the imminent danger, must be deemed an error in extremis, and not an act of negligence. The Steamer Webb, 14 Wall. 406, 20 L. Ed. 774. There is nothing else of importance in the case tending to show any negligence on the part of the barge. The respondent does not satisfactorily explain the evidence showing careless navigation down the river and out of the customary channel, although the departure from such course might not have been great. As said in The Steamer Webb, supra: "It was enough to devolve upon the tug the duty of explanation." Such explanation exonerating the steamer has not been made, and hence the Oceanica must be held solely to blame for the injuries sustained by the vessel towed.

The next question is in relation to the towage contract. Was the towage agreement only from Marquette to Buffalo? Was the master of the Oceanica acting beyond the scope of his authority in undertaking to tow the barge to the port of Tonawanda, N. Y.? The proofs show that on November 17, 1904, Boland, one of the owners of the barge, by telephone, asked the manager of the Tonawanda Iron & Steel Company, owner of the Oceanica, whether the Oceanica could

tow the Massasoit down from Marquette. Regarding the towing arrangement Mr. Mills, witness for respondent, testifies:

"I told him that it was late, that we wouldn't tow him down unless he assumed all risks, that she had the reputation of being the worst steerer on the Lakes. We had towed her before and the captain objected to having anything to do with her. He said it would help him out to get her down. He named a price. I asked for more. We finally compromised on a price; we to take no risks. It is my recollection that he stated that tugs would take charge of the boat at Buffalo."

Following this interview, he telegraphed the master of the Oceanica as follows: "Can you tow Massasoit Marquette to Buffalo? Answer. Tonawanda Iron & Steel Co." Captain Van Dusen replied: "Can tow Massasoit if ready with Oceanica." Mr. Mills thereupon answered: "Message rec'd all right tow Massasoit if she is ready." Subsequently the conversation over the telephone between Boland and Mills was confirmed by letter. Later, however, the masters of the Massasoit and Oceanica had a conversation; the former requesting towage to Tonawanda. After some discussion Captain Van Dusen assented, provided the conditions of the water in Niagara river were favorable. When the tow arrived at the Breakwater near Buffalo, the weather being clear, the Oceanica signaled the barge to shorten the tow line, which being done, the steamer proceeded down the river towards Tonawanda. The Oceanica was equipped for towing, although such was not her regular employment. She had on prior occasions towed barges to Tonawanda.

The proposition that Captain Van Dusen exceeded his authority in extending the towage agreement is not maintainable. Assuming the contract explicitly limited the port to which the barge should be towed, and that the master of the Oceanica went beyond his specific instructions, yet, in the absence of clear showing that the master of the Massasoit knew of the limitations, and that the Oceanica was doing an act expressly forbidden by her owner, I am not inclined to hold that she was relieved from the results of her subsequent wrongdoing. Her master was not expressly prohibited from towing the barge to Tonawanda. His hesitation to tow the barge beyond Buffalo, after receiving instructions from his principal, did not arise from any presumable want of authority to do so. The misconduct complained of was not the result of a breach of maritime contract. The injuries to the barge were sustained solely in consequence of the negligence of the towing steamer. And, according to the universally accepted doctrine, this action is brought in ex delicto against the ship for which she may be held liable irrespective of any responsibility that may arise as a result of a breach of contract. The Barnstable, 181 U. S. 465, 21 Sup. Ct. 684, 45 L. Ed. 954; The Malek Adhel, 2 How. 210, 11 L. Ed. 239; The Quickstep, 9 Wall. 665, 19 L. Ed. 767; Ralli v. Troop, 157 U. S. 386, 15 Sup. Ct. 657, 39 L. Ed. 742. This doctrine was recently reaffirmed by the Circuit Court of Appeals for this Circuit. The Drake-Maytham Steamship Co. v. Tugs Mason & Babcock, 142 Fed. 913. The principle of The R. F. Cahill, Fed. Cas. No. 11,735, and The Andrew J. White (D. C.) 108 Fed. 685, cited by counsel for respondent, has no application to the facts disclosed by

the record. In the Cahill Case the master of the canal boat knew that the captain of the tug had received specific instructions not to accept the tow beyond a certain point in the river. In spite of such knowledge, he prevailed upon the master of the tug to violate the specific directions in that regard of the owner. So, also, in The Andrew J. White, where the agent representing the owner of the tug declined to make a towage contract because the barkentine was in a crowded slip; he regarding it hazardous to tow her unless she was first hauled away from her mooring to the mouth of the slip. It will be noted that both masters had actual knowledge of the refusal by the owners of the tug, the night preceding, to tow the bark from inside the slip. In these circumstances the court held the tug blameless, inasmuch as the master went beyond the scope of his authority. The pith of the decisions in the Cahill and White Cases, however, is entirely based upon the fact that the masters seeking the towage service knew that such employment had previously been forbidden by the owners. Such is not the fact here. The evidence is insufficient to justify me in holding that the master of the Massasoit had presumptive knowledge of the towage contract entered into by her owner over the telephone. In the absence of the owner of the Oceanica, and in the circumstances, her master, in my judgment, had authority to bind her to an extension of the towage agreement. The Andrew J. White, supra.

One question remains: It is claimed that the agreement, in effect, provided that the towage was to be made at the risk of the barge, and therefore the Oceanica cannot be held responsible for the loss. That such was the agreement is immaterial. The Syracuse, 12 Wall. 171, 20 L. Ed. 382. There it was held that the towing steamer was liable for the loss happening through her negligence, notwithstanding the towage agreement provided for towing the canal boat at her own risk. This principle of martitime law remains unimpeached, and undoubtedly has application to this controversy.

My conclusion is that the Oceanica alone was in fault for the disaster, and hence an order of reference may be made to the clerk of this court to compute the damages. So ordered.