### THE BRITANNIA.

(District Court, E. D. Virginia. October 30, 1906.)

**1. TOWAGE—DUTIES OF TUG.**

The duty rests upon a towing tug to exercise at least reasonable skill and care in everything relating to the undertaking, having due regard to the extent of the voyage and any special hazards incident to the seas to be traversed, including, not only proper and safe navigation of the tug on the voyage, but also to see to the proper make-up of the tow and the furnishing of safe, sound, and suitable appliances and instrumentalities for the service to be performed.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 45, Towage, § 4.]

**2. SAME—LOSS OF TOW—MUTUAL FAULTS.**

A tug, which undertook the towage of two scows from Charleston to Baltimore, carried but one hawser, which parted twice in calm weather, and owing to the consequent delay the tow encountered a storm when at a dangerous part of the coast, during which the hawser parted a third time, and the scows were lost. *Held*, that the tug failed in her duty in using a hawser which was not in a suitable and sound condition, and in not being provided with an extra one for such a voyage; that the owner of the scows was also chargeable with fault contributing to the loss, in that they were not sufficiently seaworthy for the voyage, but leaked and were

largely filled with water before the last breaking of the line, in conse-quence of which mutual faults the damages should be divided.

In Admiralty. Suit to recover for loss of scows in tow.

On the 24th day of July, 1905, Charles W. Eaton, representing the Standard Dredging Company, a corporation, contracted with the American Towing & Lightering Company of Baltimore for the towage of four scows from Mobile, Ala., to Baltimore, Md. The four scows left Mobile in tow of respondent's tug Buccaneer, and in due course put into Charleston S. C. At this point it was deemed desirable to divide the tow, in view of the voyage around Hatteras, and the towing company thereupon agreed to furnish their tug Tormentor to assist in the tow. The latter tug, however, was not used, being under charter, and, with the consent of the libelant, the Britannia was substituted for her, and left Baltimore on the 17th of August for Charleston, to perform the serv-ice at an agreed compensation of $150 per day from Baltimore south and re-turn to Baltimore, including the use of one 9-inch manila 250-fathom sea towing hawser.

On the 11th of August, 1905, the tug Buccaneer left Charleston with scows Nos. 1 an ˙ 2 of said original tow, bound for Baltimore, and, while passing through Charleston Bar, the tug fetched up, breaking her shoe, rudder post, and wheel, causing her to return with her tow to Charleston for repairs. Sub-sequently, on the 22d day of August, the Britannia, having several days be-fore reached Charleston, about 6 o'clock of that morning, put to sea with scows No. 1 and 2, on a 9-inch manila hawser, 240 fathoms long. At the same time, the Buccaneer started towing scows 3 and 4. The voyage thus commenced was proceeded with under favorable weather, and without special incident, until on the morning of the 23d of August, when off Cape Romaine, near the port of Georgetown, S. C., the hawser of the Britannia parted about 30 feet aft of her stern. The parted ends were knotted together, and the tug resumed her voy-age with the said scows. The Buccaneer, in the meantime, proceeded without interruption. About 7:30 o'clock of the same morning, the weather conditions remaining favorable, and while still in the vicinity of Georgetown, the Brit-annia's hawser again parted some 10 feet aft of the first break. A further stop was made, the hawser picked up, the knotted ends taken into the tug, and the remainder of the hawser made fast to the stern bits of the tug. The original length of the hawser was considerably reduced, say from 240 to 190 fathoms. Several hours were lost by the Britannia, occasioned by the two breaks of her hawser, and she never again overtook the Buccaneer. Capt. Muir, as the representative of the libelant, was on the Britannia from Charleston, and upon the scows were two 200-fathom new Plymouth cord 6-inch lines, which he claims could have been easily used for towing, and that he suggested their use to the Britannia's master after the second break. This, however, the latter denies, and further insists that they could not have been used on the occasion in question. The Britannia proceeded with this shortened hawser until about 9 o'clock on the morning of Saturday, the 26th of August, when off life saving station 9, Currituck Beach, a strong wind blowing from the E. N. E., with considerable sea; that, owing to these conditions, the tug dropped back and took the men off the scows, as waves were breaking over them; that said scows were at this time leaking, the head scow being about three feet above water, and the latter one foot; that the tug continued with said tow until about 4 o'clock of the same day, the storm having in the mean-time increased in violence, when off the coast several miles to the north of Currituck Lighthouse the hawser parted for the third time, near the tug, and, it being impracticable to again make fast to the scows, under the then weather conditions, the same were abandoned, and proved a total loss.

Floyd Hughes and J. Warren Coulston, for libelant.
R. H. Smith and H. H. Little, for respondent.

WADDILL, District Judge. (after stating the facts). This libel was filed to recover for the value of two scows lost.

Various assignments of negligence are made by the parties one against the other; but the case turns upon whether the accident arose because of the unseaworthiness of the libelant's scows, or the failure of the tug to exercise the degree of care and caution required of it for the safe conduct of her tow, including, particularly, the furnishing of a proper hawser or hawsers with which to perform the service, or from said causes combined. The duty of the libelant to furnish scows sufficiently seaworthy to make the voyage is apparent, and the law governing the tug's liability is well settled. The tug is not a common carrier, and hence not bound by rules determining liability in such cases; nor is she an insurer of the safety of the tow. Presumptions of negligence do not arise against her, but the same must be established by the libelant. Nevertheless, the law imposes upon the tug the duty of exercising the degree of caution and skill which prudent navigators usually employ in such service. Some of the authorities, the business in hand being one as to which those offering their services are specially familiar, hold that they shall exercise a high degree of care and caution. At least, the burden is imposed to exercise reasonable skill and care in everything relating to the undertaking, having due regard to the extent of the voyage, and any special hazards incident to the seas to be traversed, which includes, not only proper and safe navigation of the tug on the journey, but the furnishing of safe, sound, and suitable appliances and instrumentalities for the service to be performed, and the proper make-up of the tow preparatory to the voyage. These are obligations imposed upon and assumed by the tug from the nature of the employment, and for damage arising from the failure to observe them she cannot escape liability. The Webb, 81 U. S. 406, 414, 20 L. Ed. 774; The Margaret, 94 U. S. 494–496, 24 L. Ed. 146; Transportation Line v. Hope, 95 U. S. 297, 300, 24 L. Ed. 477; The J. P. Donaldson, 167 U. S. 599, 603, 17 Sup. Ct. 951, 42 L. Ed. 292; The Ravenscourt (D. C.) 103 Fed. 668, 671; The Kalkaska, 107 Fed. 962, 47 C. C. A. 100; The Francis King, 7 Ben. (U. S.) 11, Fed. Cas. No. 5,042; Hughes, Admr. 123, 124.

A great deal of evidence was taken in the case, largely before the court, but some by deposition, and as to many questions there was an irreconcilable conflict, some of which it is found unnecessary to pass upon, or, indeed, to enter on a general discussion respecting the same, further than to say that the entire evidence has been fully considered and carefully weighed by the court, and the conclusions reached upon the essential issues of the case are as follows:

First. That the libelant was not free from fault in furnishing scows sufficiently seaworthy for the voyage; and therefore, so far as the same may have entered into and caused the accident in question, should share in the loss sustained. The scows were brought from Mobile to Charleston, en route to Baltimore, on this same voyage, and it was found necessary to go into Charleston partly because of the scows' leaky condition, where they were pumped out. After several days' delay, scows 1 and 2 were placed in tow of the Britannia, and 3 and 4 in tow of the Buccaneer. The first two encountered bad weather in the vicinity of and after passing Hatteras, and began to leak, and,

with the increase of the storm, the last scow in the tow filled with water, and the first one became nearly submerged, and upon the giving way of the hawser herein referred to, off Currituck Lighthouse station, they were lost at sea. The Buccaneer, with scows 3 and 4, being at the time of the storm several hours in advance of the Britannia on the voyage, entered the Virginia Capes in safety, as doubtless numbers 1 and 2 would have done if they had not, by reason of their detention, encountered the full and continued bad weather in question. Storms, however, are perils of navigation incident to such a voyage, and ought to have been anticipated and provided against by the scow owner, and for losses arising therefrom, or into which such conditions enter, the owner must suffer.

Second. That the tug failed to furnish a safe and suitable hawser to perform her contract of towage, which in part caused the accident, and in consequence of which she should share in the loss sustained. It may be conceded that the tug ordinarily would not be responsible for the parting of its hawser, under the circumstances and conditions of this accident, provided due care and caution had been exercised in procuring a suitable one, which had been properly preserved and seasonably inspected; and that the tug owner should not be held liable for a hawser's breaking merely because of the happening of the event. But when the fact is taken into account that upon this same voyage, in good weather, and smooth sea, this hawser had twice before parted, the court cannot say that the defective condition of the hawser did not cause it to part, and certainly that a sound hawser might not have averted such an occurrence.

The libelant claims that the tug should have had an extra hawser on board with which to make ocean voyages of the kind in question, and that such was the custom; and, moreover, insists that upon each of the scows were two six-inch manila hawsers, and that, at the time of the second breaking, those on the front scow were offered to the tug, and should have been accepted, which would have prevented the loss. Respondent says that it was impracticable to use two six-inch hawsers, and that the tug's hawser was sufficient in length and strength after the second breaking, for the safe termination of the voyage, and the first breaking was the result of disturbance in the sea, though the weather was good, from what was known as a ground swell; and that the fact that the shortened hawser withstood the strain upon it from the time of the second breaking to the final parting of the same, six or seven hours of which was during the continuance of a storm, was sufficient evidence of the soundness and suitable condition of the hawser. And the tug denies that there was either necessity for or the existence of a custom to carry more than one hawser on a voyage of that kind. Much of the evidence centered around these last-stated propositions, and the conflict was sharply drawn as to many of them. The court is convinced, however, that, at the time of the first two breakings of the hawser, no such conditions of weather or sea prevailed as to cause a sound hawser to part; and, while it may or may not have been the custom to take an additional hawser on sea voyages of the kind in question, the result in this case proves the great desirability of so

doing, and of the necessity for such a custom, if it does not prevail. Good seamanship would seem to indicate that in so important and dangerous an undertaking, as the towage of scows or barges at sea, on a voyage of the length and probable hazard of the one in question, with a single hawser, too many contingencies were liable to arise to have everything staked upon the parting or giving way of a single rope. The tug insists that neither scow was equipped with a hawser suitable to take the place of the one provided by her. By reason, therefore, of her failure to have a second hawser, she was forced to continue on her voyage, hundreds of miles, and along one of the most dangerous and treacherous parts of the Atlantic seaboard, with a twice broken hawser as her only stay and means of protection for the property and lives of those intrusted to her keeping. Such provision, under the circumstances, did not constitute due care and caution on the part of the tug owner. It is hardly conceivable that a second hawser, if at hand, would not have been used after the first one had twice parted, which in all probability would have averted this loss; and, while it is true the one used did withstand a considerable strain, it cannot be said that a hawser in a suitable and sound condition, and not bearing the strain incident to the shortening of the same, some 40 fathoms at least, because of the previous partings, would not have withstood the strain put upon it. The Burlington, 137 U. S. 386, 392, 11 Sup. Ct. 138, 34 L. Ed. 731. While it appears that the hawser was not an especially old one, it had been exposed to causes which might have affected its strength. The raveled ends of the parted hawser, at the parting which caused the accident, though in the possession of the tug, were not exhibited to the court, though what were claimed to be other portions of it were; and there was some evidence to show the chafing of the hawser, and one witness for the tug testified that the hawser where it first broke was burned.

It is no defense for the tug to say that the scows' six-inch hawsers were not availed of because of their size and insecurity, and hence that they had to use their own broken hawser. The law imposed upon her the duty of making up the tow and seeing that proper lines were provided, either by the tow or herself. If those on the scow were unfit for the service, others should have been provided before entering upon the voyage, and for loss arising from such defective hawser, whether the same were furnished by the tow or tug, the latter is liable. These are obligations imposed upon and assumed by the tug from the nature of the employment, and for damages for her negligence in this respect she should be held responsible. The Quickstep, 76 U. S. (9 Wall.) 665. 671, 19 L. Ed. 767; The Syracuse, 79 U. S. (12 Wall.) 171, 20 L. Ed. 382; The John G. Stevens, 170 U. S., 113, 125, 18 Sup. Ct. 544, 42 L. Ed. 969; The Somers N. Smith (D. C.) 120 Fed. 569, 576; The Emery Temple (D. C.) 122 Fed. 180; The W. G. Mason (C. C. A.) 142 Fed. 913, 918; The Oceanica (D. C.) 144 Fed. 301, 305.

Third. Suggestion was made in argument that the loss in question was the result of a peril of the sea, from which no liability could follow. This suggestion is not put in issue by the pleadings; but it may be said in passing that the condition and character of the storm was not

:such, in the estimation of the court, as to have seriously endangered the safe voyage of the tug and tow, had the tug been supplied with suitable hawsers, and the scows in proper condition to withstand storms such as might have been anticipated, particularly at that season of the year. And, in this connection, sight cannot be lost of the fact that the two first partings of the hawser in their result affected the last breaking, in that the time lost in the repair of the first partings delayed the tow, and caused it the longer to encounter the dangers and strains upon its hawser, arising from the existence of the then weather conditions. The Buccaneer, that was not so detained, passed safely into the Capes with her tow, as doubtless the Britannia would have done, but for her detention; and the fact that the Buccaneer with her tow found no difficulty in navigation, arising either from the ground swell referred to at the time of the first parting of the Britannia's hawser, or from the weather on the day of the last parting, goes far to show the nonexistence of such conditions on either occasion as would have seriously endangered the Britannia's tow, had she been equipped with a proper hawser.

It follows, from what has been said, that the loss in this case arose from the concurring negligence of the tug and the tow, and that the damages arising therefrom should be divided between them; and a decree may be entered accordingly.